IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| BUSINESS SYSTEMS ENGINEERING, INC. ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> INTERNATIONAL BUSINESS ) <br> MACHINES CORPORATION ("IBM") ) <br> ) <br> Defendant. ) <br> ) <br> ) <br> _____ ) | Case No. 04C 8254 <br><br> Judge Elaine E. Bucklo <br><br> Magistrate Judge Arlander Keyes |

APPENDIX OF WESTLAW AUTHORITIES
CITED IN IBM'S MEMORANDUM OF LAW SUPPORTING
ITS MOTION TO DISMISS AMENDED COMPLAINT

INDEX

**Cases**                                                                                                   **Tab**

*AKW Constr. and Envt'l. Serv., Inc. v. Galioto*,
    No. 98 C 7104, 2000 WL 1809976 (N.D. Ill. Dec. 11, 2000) ............................................... 1

*Anderson v. BASF Corp.*,
    No. 00 C 6804, 2001 WL 1035211 (N.D. Ill. Aug. 4, 2001) ................................................. 2

75159v1

Tab 1

Westlaw.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2000 WL 1809976
(Cite as: Not Reported in F.Supp.2d)

Page 1

C
Not Reported in F.Supp.2d, 2000 WL 1809976
Only the Westlaw citation is currently available.
United States District Court, N.D. Illinois, Eastern Division.
AKW CONSTRUCTION AND ENVIRONMENTAL SERVICES, INC., Plaintiff,
v.
John GALIOTO, and Laborers' Local No. 225, Laborers' International Union of North America, AFL-CIO, Defendants.
No. 98 C 7104.

Dec. 11, 2000.

*MEMORANDUM OPINION AND ORDER*

KENNELLY, J.
*1 Defendants John Galioto and Local No. 225 of the Laborer's International Union of North America have moved for summary judgment and to strike portions of plaintiff's statement of facts submitted in opposition to that motion. For the reasons stated below, the Court grants the motion to strike in part and grants the motion for summary judgment.

Background

AKW Construction and Environmental Services, Inc. performs asbestos abatement. Beginning in August of 1996, it submitted bids to the Chicago Public Schools ("CPS") seeking contracts for asbestos abatement work. At that time, Carnow, Conibear & Associates, Inc. ("CCA"), an occupational environmental health consulting firm, administered and awarded contracts for lead and asbestos abatement on behalf of CPS. AKW was pre-certified as an approved contractor; it submitted a number of bids and received one contract, for approximately $1,370,000, which eventually increased to approximately $4,300,000 because of " extras."

Local 225 members provided the labor for AKW's CPS asbestos abatement work. Galioto was the business manager for Local 225; his duties included ensuring contract compliance with collective bargaining agreements. In the fall of 1996, Galioto maintains, he began receiving information from union members that AKW was violating various provisions of its collective bargaining agreement. Galioto communicated his concerns to CCA and ultimately to CPS. The Union eventually filed grievances against AKW. After the Union filed its grievances, AKW nonetheless maintained its status as a pre-certified contractor and was free to submit bids for additional work or contracts.

In the spring of 1997, CPS hired Lyceum Consultants to coordinate the lead and asbestos work in place of CCA. Lyceum's regional managers then took bids from subcontractors for the work. AKW remained approved as a contractor and was never prevented from bidding for work. It contacted some of Lyceum's regional managers, but it did not submit any bids. In 1998, AKW stopped operating when three of its principals formed a new company.

Discussion

I. Defendants' Motion to Strike Additional Facts

Galioto and Local 225 have moved to strike portions of the statement of facts submitted by AKW in opposition to summary judgment pursuant to former Local Rule 12(N) (now Local Rule 56.1(b)). We address this motion first because it affects the outcome of defendants' summary judgment motion.

Rule 56(e) of the Federal Rules of Civil Procedure states that "affidavits shall be made on *personal knowledge,* shall set forth such facts as would be *admissible in evidence,* and shall show affirmatively that the affiant is competent to testify to the matters

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

stated therein." Fed.R.Civ.P. 56(e) (emphasis added). Pursuant to this rule, if an affidavit submitted in support of or in opposition to summary judgment contains statements beyond the affiant's personal knowledge, those statements must be excluded. *See Stagman v. Ryan,* 175 F.3d 986, 995 (7th Cir.1999) (holding that all but one of the *statements in the affidavit that plaintiff relied upon* did not satisfy Rule 56(e) ); *Abioye v. Sundstrand Corp.,* 164 F.3d 364, 368 (7th Cir.1998). Statements that result from speculation or conjecture, or that are conclusory, likewise do not satisfy Rule 56(e), and a court should not consider them. *See Abioye,* 164 F.3d at 368; *Box v. A & P Tea Co.,* 164 F.3d 364, 368 (7th Cir.1985) (affirming district court's decision to strike affidavits filed in opposition to summary judgment); *Malec v. Sanford,* 191 F.R.D. 581, 584-85 (N.D.Ill.2000). Moreover, a party may not rely on inadmissible hearsay in supporting or opposing summary judgment, just as it may not introduce hearsay evidence at trial. *Malec,* 191 F.R.D. at 585. Thus, a court should not consider statements in an affidavit or deposition submitted in connection with summary judgment that constitute inadmissible hearsay. *See Bombard v. Fort Wayne Newspapers,* 92 F.3d 560, 562 (7th Cir.1996) ; *Wigod v. Chicago Mercantile Exchange,* 981 F.2d 1510, 1519 (7th Cir.1992).

A. Shawn Brown's Affidavit

*2 Defendants contend that Shawn Brown lacks the personal knowledge necessary to make the statements in paragraphs three through seven of his affidavit. Brown was the Director of Asbestos and Lead Services for CCA from August 1, 1996 through December 31, 1997; his affidavit indicates that he was "responsible for supervising some of the work performed by AKW to remove asbestos and lead from the Chicago Public Schools." Brown Affid. ¶ 1. Brown says that AKW performed the abatement in a workmanlike manner and in compliance with safety standards. *Id.* ¶ 2. He states that Galioto made complaints about AKW to CCA from October, 1996 through December, 1997 and that Brown's office investigated the complaints and found that they had no basis. *Id.* ¶¶ 3-4. Brown also states:

5. The conduct of Laborers Local 225 in making numerous unwarranted complaints against AKW's work performance was disruptive and interfered with the environmental projects of AKW in which CCA was responsible for [sic] at the Chicago Public Schools.

6. Due to the constant complaints and allegations from Laborers Local 225, CCA discontinued its practice of inviting AKW to bid on its environmental abatement projects.

7. Although AKW was the lowest bidder on an environmental abatement project in late 1997 to remove asbestos from the Crystal Lakes School, but [sic] they were not awarded that contract due to the undeserved and unwarranted negative exposure and heat created by Laborer [sic] Local 225 in accusing AKW of improper work performance. *Id.* ¶¶ 5-7.

Defendants argue that Brown's affidavit does not reflect that he has personal knowledge of matters relating to CCA's bid award decisions. In *Abioye v. Sundstrand,* the plaintiff alleged that the defendant terminated his job on the basis of his age, race, and national origin; the defendant maintained that it had fired the plaintiff because of his poor work performance. 164 F.3d at 366-67. Abioye submitted affidavits to show that Sundstrand treated young white employees better than him, but the district court struck portions of those affidavits because they represented mere "conjecture based on rumor," as the affiants had no apparent personal knowledge to make the comparison drawn in their affidavits. *See id.* at 368. The Seventh Circuit affirmed. *See id.* Like the affidavits in *Abioye,* Brown's affidavit reflects no personal knowledge of the alleged complaints about AKW and, more importantly, no personal knowledge of the alleged repercussions from the complaints. Brown's affidavit indicates only that he supervised, for a limited time, some work that AKW performed for CPS; it does not indicate that he had any involvement with the bidding process at CCA.

AKW argues that Brown's personal knowledge may be inferred from the contents of his affidavit and the nature of his job. In *Barthelemy v. Air Lines Pilots Association,* 897 F.2d 999 (9th Cir.1989), one

Not Reported in F.Supp.2d                                                                                                Page 3

Not Reported in F.Supp.2d, 2000 WL 1809976
(Cite as: Not Reported in F.Supp.2d)

affiant was the chairman of an airline; the court inferred that he had personal knowledge of the airline's search for possible buyers and of its fear of one potential buyer in particular as these matters involved tasks falling within a chairman's duties. *Id.* at 1018. A second affiant had represented a party in negotiations, and his affidavit made this clear; the court inferred that he had personal knowledge of the details of the negotiations. *Id. See also Cattawba Indian Tribe v. South Carolina*, 978 F.2d 1334, 1342 (4th Cir.1992) (presuming an individual to have personal knowledge of land possession by a family member). AKW argues that Brown's sometime supervision of AKW's work for CPS implies that he had personal knowledge of the bidding process at CCA and of alleged Union complaints about AKW. The Court disagrees. We have been given nothing that indicates that involvement in the bidding process or complaint-fielding came under the umbrella of Brown's job. Moreover, Brown's affidavit provides no information that would permit us to make such an inference.

*3 The Court concludes that the statements in paragraphs three through seven of Brown's lack a sufficient foundation for admissibility. Plaintiff has not established that Brown has personal knowledge of those matters; his knowledge likely is premised on inadmissible hearsay. Because those statements do not satisfy the requirement of admissibility in evidence, the Court strikes them, as well as paragraphs twenty-three, twenty-six through twenty-eight, thirty, and thirty-one of AKW's statement of additional facts submitted in opposition to summary judgment, insofar as those statements are based on Brown's affidavit. FN1

> FN1. Paragraphs 26 and 28 are also based on the deposition testimony of Michael Palmieri, which we deal with in the following section of this opinion.

B. Michael Palmieri's Deposition Testimony

Michael Palmieri was responsible for the bonding and financing of AKW and had a twenty percent interest in the company. Palmieri Dep. at 14. He participated on AKW's behalf in bidding on CPS projects with CCA. *See id.* at 18. In his deposition, Palmieri answered questions about bidding for abatement jobs through 1998, when AKW ceased operations. He described the process of how CCA awarded bids. *See* Pltf. 12(N) Stmt. ¶¶ 7-12. He also described the nature and frequently of Galioto's complaints to CCA and CPS. *See id.* ¶¶ 24-25. Palmieri testified that he learned from CCA employees that CCA decided to award the Crystal Lake contract to another bidder because of Galioto's complaints and that CCA determined not to send AKW any additional bid requests for the same reason. *See id.* ¶¶ 26, 28, 29. FN2

> FN2. Palmieri says that Brown was his source of information about the Crystal Lake job. *See* Palmieri Dep. 46; Pltf. 12(N) Stmt. ¶ 28. But Palmieri's recounting of this conversation is inadmissible hearsay, and as discussed earlier, Brown's affidavit contains no basis for him to make such a statement on personal knowledge.

Defendants argue there is no evidence that Palmieri had any involvement, or personal knowledge of, CCA's or CPS's decision making process. The Court agrees. Palmieri was an employee of AKW, not CCA or CPS. Without direct involvement in CCA's bid award process, Palmieri cannot possibly have the requisite personal knowledge upon which to base these statements. In testifying about why AKW did not receive more contracts for CPS, Palmieri was simply repeating statements made to him by CCA employees (who themselves had no demonstrated personal knowledge of the bid award process). Palmieri's testimony in this regard is inadmissible.

AKW counters that Palmieri has personal knowledge of the bidding process due to his role as an officer of a corporation that was involved in that process. On the contrary, there is no basis to believe that an officer of a company that presents bids to CPS or CCA would have any *personal* knowledge of the reasons why CCA or CPS acted as they did. Moreover, Palmieri stated in his deposition that he

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

could not answer questions about the number of bidders, and he deferred the questioner to CCA for such information. Palmieri Dep. at 81. This is tantamount to a concession by Palmieri that he lacks personal knowledge about the bidding process. Palmieri's statements regarding what CCA heard, what it did, and why it did what it did do not constitute admissible evidence. The Court therefore strikes paragraphs seven through twelve, twenty-four through twenty-six, twenty-eight, and twenty-nine of plaintiff's statement of additional facts.

## II. Defendants' Motion for Summary Judgment

*4 Under Federal Rule of Civil Procedure 56(c), a court should grant summary judgment if no genuine issue of material fact exists, and the moving party is entitled to judgment as a matter of law. The moving party carries the burden of identifying portions of pleadings, answers to interrogatories, and affidavits that show the absence of a genuine issue of material fact. Fed.R.Civ.P. 56(c) ; *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To meet its burden, the moving party may point out that the opposing party lacks evidence to support an essential element of its claim. See *Celotex*, 477 U.S. at 325. The burden then shifts to the nonmoving party to offer specific facts showing that there is a genuine issue for trial. Fed.R.Civ.P. 56(c) ; *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The party that bears the burden of proof on an issue may not rest on the pleadings, but must demonstrate affirmatively that there is a genuine issue of material fact. Fed.R.Civ.P. 56(e) ; *Celotex*, 477 U.S. at 324; *Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 923 (7th Cir.1994). "Material" facts might affect the outcome of the suit under the governing substantive law, and the material facts create a "genuine" issue when a reasonable trier of fact could find for the nonmoving party. See *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ; *Eiland v. Trinity Hospital*, 150 F.3d 747, 750 (7th Cir.1988). When reviewing a summary judgment motion, the court must construe the facts in a light most favorable to the nonmoving party. *Anderson*, 477 U.S. at 255; see also *Popovits v. Circuit City Stores, Inc.*, 185 F.3d 726, 731 (7th Cir.1999).

AKW claims that the defendants tortiously interfered with its prospective business relationships with CCA and CPS and that as a result, it received no further abatement contracts. To succeed on this claim, AKW must show a valid expectation of future business, defendants' knowledge of that expectation, purposeful interference that prevented the fulfillment of AKW's expectation, and damages resulting from the interference. See *Delloma v. Consolidation Coal Co.*, 996 F.2d 168, 171 (7th Cir.1993) ; *Laser Industries, Ltd. v.. Eder Instrument Co.*, 573 F.Supp. 987, 993 (N.D.Ill.1983); *Soderlund Brothers, Inc. v. Carrier Corp.*, 663 N.E.2d 1, 10 (1995) (affirming summary judgment where defendant's statements did not affect city's failure to grant contracts to plaintiff).

AKW attempts to establish tortious interference using inadmissible evidence from Brown's affidavit and Palmieri's deposition, as described above. We have already stricken that evidence. The remaining admissible evidence is not sufficient to permit AKW to avoid summary judgment. First, AKW has no admissible evidence that Galioto's actions caused AKW to lose any business. It has offered no evidence from any person with knowledge of CCA's decisions who can say or even suggest that AKW would have received contract awards except for Galioto's actions.

*5 Second, AKW's evidence is not sufficient to permit a jury to conclude that AKW had any valid expectation of future work from CPS or CCA. Mere hope or opportunity of a business relationship does not suffice to show reasonable expectation of a business relationship for a tortious interference claim. See *Anderson v. Vanden Dorpel*, 172 Ill.2d 399, 406, 667 N.E.2d 1296, 1299 (1996). Here, AKW received one contract but did not submit bids for more work after Lyceum replaced CCA in organizing the bid process. It remained an approved contractor, and no one ever prevented AKW from submitting bids. AKW's failure to submit bids makes it impossible to say that Galioto's complaints had anything to do with why AKW got no further contract awards. In short, AKW has failed to offer admissible evidence that defendants' alleged

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 5

Not Reported in F.Supp.2d, 2000 WL 1809976
(Cite as: Not Reported in F.Supp.2d)

interference prevented it from entering into a business relationship.

Finally, summary judgment is appropriate because AKW's damage allegations are too speculative upon which to base a claim. *See Transportation & Transit Assoc., Inc. v. Morrison Knudsen Corp.,* No. 98 C 2827, 1999 WL 116229, at *4 (N.D.Ill. Feb. 26, 1999). In that case, a subcontractor contracted with a construction company for business on a "most favored" basis; when another entity acquired the construction company, the subcontractor sued the defendant on the basis of a liquidated damages clause and a preferred vendor clause. The court held that plaintiff's damage claim was too speculative to avoid summary judgment, and that even if the plaintiff could demonstrate that it should have had the opportunity to bid on certain projects, it could not show that it would have won the contracts. *Id.* The same is true here; any damages that AKW claims are speculative. Though AKW stresses that there is no need to show damages with precision, there *is* a need to establish a basis for assessing damages or recovery, and that basis is missing here.

Conclusion

For the reasons stated above, defendants' motion to strike portions of plaintiff's statement of additional facts is granted in part. Defendants' motion for summary judgment is granted. The clerk is directed to enter judgment in favor of defendants.

N.D.Ill.,2000.
AKW Const. and Environmental Services, Inc. v. Galioto
Not Reported in F.Supp.2d, 2000 WL 1809976

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Tab 2

Westlaw.

Not Reported in F.Supp.2d                                                                     Page 1

Not Reported in F.Supp.2d, 2001 WL 1035211
(Cite as: Not Reported in F.Supp.2d)

C
Not Reported in F.Supp.2d, 2001 WL 1035211
Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court, N.D. Illinois, Eastern Division.
Mark A. ANDERSON and Donald R. Anderson, Plaintiffs,
v.
BASF CORPORATION, a Delaware corporation, Defendant.
No. 00 C 6804.

Aug. 4, 2001.

MEMORANDUM OPINION AND ORDER

LEFKOW, District J.
*1 Plaintiffs, Mark A. Anderson and Donald R. Anderson, both Illinois citizens, filed a complaint against BASF Corporation ("BASF"), a Delaware corporation, for breach of contract (Counts I & II), violation of the Illinois Wage Payment and Collection Act ("IWPCA"), 820 ILCS 115 et seq. (Count III), and violations of the Consolidated Omnibus Budget Reconciliation Act ("COBRA"), 29 U.S.C. § 1161 et seq., which amended and is part of the Employee Retirement Income Security Act of 1974 ("ERISA"). BASF moves to dismiss counts I through III and to strike portions of Counts IV and V. The court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1332. For the reasons set forth herein, the court grants in part and denies in part BASF's motion to dismiss and grants in part and denies in part BASF's motion to strike.

BACKGROUND

Until at least June 1, 2000, plaintiffs were both employed by Chemdal Corporation ("Chemdal"), a manufacturer of superabsorbent polymers used primarily in the manufacture of diapers and other personal hygienic products (the "SAP Business"). Chemdal was owned by Chemdal International Corporation, which in turn was owned by AMCOL International Corporation ("AMCOL"). On or about November 22, 1999, AMCOL entered into an Asset and Stock Purchase Agreement ("Purchase Agreement") with BASF Aktiengesellschaft ("BASF AG"), wherein the Sellers, which included AMCOL and AMCOL affiliates transferring SAP assets, agreed to sell the SAP Business to BASF AG, the Purchaser.

According to plaintiffs, pursuant to the terms of the Purchase Agreement, the sale would not result in severance of employment for "transferred employees" such as themselves. Rather, each such employee would have continuous and uninterrupted employment before and after the closing. Also, plaintiffs allege that under the Purchase Agreement, defendant BASF, as the designated affiliate of BASF AG, agreed to assume the liabilities of Chemdal, and agreed to be responsible for any severance obligations incurred pursuant to Chemdal's severance policies with respect to the termination of a transferred employee on or after the closing. For purposes of the sale, the Sellers attempted to summarize their severance policies in an attachment to the Purchase Agreement, which indicated that Chemdal Vice Presidents were entitled to 9 months of severance and that other Chemdal officers were entitled to 6 months of severance. Plaintiffs assert, however, that the severance policies as to officers were normally unwritten, and that in actuality, Chemdal officers were given a minimum of 18 months severance and a like number of months of health and dental insurance benefits.

Plaintiffs allege that when the sale took place, on or about June 1, 2000, they became BASF employees, but that after the closing, BASF offered plaintiffs positions on terms considerably less advantageous than the terms that plaintiffs were receiving with Chemdal. Plaintiffs did not accept the offers, but

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Page 2

Not Reported in F.Supp.2d, 2001 WL 1035211
**(Cite as: Not Reported in F.Supp.2d)**

did not resign. BASF subsequently terminated them. Plaintiffs demanded the severance benefits provided by Chemdal's polices and practices, but BASF refused to pay. In Counts I and II, plaintiffs seek to recover severance benefits for breach of contract.

*2 Plaintiff Donald Anderson also alleges that on or about June 16, 2000, Deborah Halbfoster (" Halbfoster") of BASF advised him that he had 40 days of vacation as a result of the merger. BASF has since refused to pay plaintiff for five of those 40 days, contending that he is entitled to only 35 days of vacation. In Count III, Donald Anderson seeks to recover the five days vacation pay, and attorneys fees and costs, for violation of IWPCA.

Plaintiffs further allege that BASF terminated Mark Anderson on June 13, 2000 and Donald Anderson on June 19, 2000. Plaintiffs claim that their terminations constitute "qualifying events" under COBRA, triggering BASF's and its plan administrator's obligation to notify plaintiffs of their COBRA rights within 44 days, but that plaintiffs were not notified of their rights until September 11, 2000. As a result, plaintiffs were forced to obtain health insurance for themselves and their families at their own expense. In Counts IV and V, plaintiffs seek various forms of relief for the alleged COBRA violations.

DISCUSSION

I. Defendant's Motion to Dismiss Counts I-III

Defendant moves pursuant to Federal Rule of Civil Procedure 12(b)(6) to dismiss both plaintiffs' breach of contract claims (Counts I & II) and plaintiff Donald Anderson's IWPCA claim (Count III). A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) challenges the sufficiency of the complaint for failure to state a claim upon which relief may be granted. *General Electric Capital Corp. v. Lease Resolution Corp.,* 128 F.3d 1074, 1080 (7th Cir.1997). Dismissal is appropriate only if it appears beyond a doubt that the plaintiff can prove no facts in support of its claim that would entitle it to relief. *Conley v. Gibson,* 355 U.S. 41,

45-46, 78 S.Ct. 101, 102 (1957) ; *Kennedy v. Nat'l Juvenile Det. Assoc.,* 187 F.3d 690, 695 (7th Cir.1999). In ruling on the motion, the court accepts as true all well pleaded facts alleged in the complaint, and it draws all reasonable inferences from those facts in favor of the plaintiff. *Jackson v. E.J. Brach Corp.,* 176 F.3d 971, 977 (7th Cir.1999) ; *Zemke v. City of Chicago,* 100 F.3d 511, 513 (7th Cir.1996).

Breach of Contract Claims (Counts I & II)

Defendant argues that Counts I and II should be dismissed because plaintiffs' complaint fails to plead facts to support most of the requisite elements of a breach of contract claim. In order to state a claim for breach of contract under Illinois law, FN1 a plaintiff must allege: (1) the existence of a valid and enforceable contract; (2) performance by the plaintiff; (3) breach of contract by the defendant; and (4) resultant injury to the plaintiff. *Gonzalzles v. American Express Credit Corp.,* 733 N.E.2d 345, 351 (Ill.App.Ct.2000) ; *Carroll v. Acme-Cleveland Corp.,* 955 F.2d 1107, 1114-15 (7th Cir.1992).

> FN1. Although the Purchase Agreement provides that it shall be construed in accordance with Delaware law, *see* Compl., Ex. A § 11.11, both parties have relied primarily on Illinois law and do not assert a choice of law issue. *Massachusetts Bay Ins. Co. v. Vic Koenig Leasing, Inc.,* 136 F.3d 1116, 1120 (7th Cir.1998) (" ' The operative rule is that when neither party raises a conflict of law issue in a diversity case, the federal court simply applies the law of the state in which the court sits [.]" ') (quotation omitted). Likewise, although the Purchase Agreement provides that actions relating to the Purchase Agreement "shall be heard and determined in any Delaware state or federal court sitting in Wilmington," *see* Compl., Ex. A § 11.11, the parties have acquiesced to litigation in this court, *see Van Den Biggelaar v. Wagner,* 978 F.Supp. 848, 856 (N.D.Ind.1997) (party

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                        Page 3

Not Reported in F.Supp.2d, 2001 WL 1035211
(Cite as: Not Reported in F.Supp.2d)

waived forum selection clause by litigating in another forum), and, in any event, any defense based on venue or lack of personal jurisdiction was required to have been brought with the instant motion to dismiss. *See* Fed.R.Civ.P. 12(h)(1) (defenses of personal jurisdiction and improper venue are waived if not included in preliminary motion under Rule 12(g) ); *Graff v. Nieberg,* 233 F.2d 860, 865 (7th Cir.1956) (personal jurisdiction); *Elbinger v. Precision Metal Workers Corp.,* 18 F.R.D. 467, 468-69 (E.D.Wisc.1956) (improper venue and personal jurisdiction).

Plaintiffs concede in their response that they are not parties to the Purchase Agreement but argue that they are third-party beneficiaries. Under Illinois law, a third-party beneficiary may bring an action to remedy the breach of a contract only if the parties to the contract specifically intended the third party to benefit from the agreement. *Golden v. Barenborg,* 53 F.3d 866, 870 (7th Cir.1995) (citing *Carson Pirie Scott & Co. v. Parrett,* 178 N.E. 498, 501 (Ill.1931)). "If the benefit is merely incidental, the third person has no right of recovery arising from the contract." *Id.* The parties' intent is manifested through the language of the contract. *Id.* "[T]here is a strong presumption that parties to a contract intend that the contract's provisions apply to *only* them and not to third parties." *Quinn v. McGraw-Hill Cos.,* 168 F.3d 331, 334 (7th Cir.1999) (quoting *155 Harbor Drive Condo. Ass'n v. Harbor Point, Inc.,* 568 N.E.2d 365, 375 (Ill.App.Ct.1991)). To overcome this presumption, "[e]xpress language in the contract identifying the third-party beneficiary is the best evidence of intent to benefit that party," but intent can also be shown by an implication so strong as to amount to an express declaration. *Id.* "Without an express declaration ... ambiguous language in a contract will not suffice to make someone a third-party beneficiary." *Id.* Whether a plaintiff is a third-party beneficiary is a legal conclusion that the court need not accept for the purpose of a motion to dismiss. *See Choi v. Chase Manhattan Mortgage Co.,* 63 F.Supp.2d 874, 881 (N.D.Ill.1999).

*3 Plaintiffs argue that the language in the Purchase Agreement providing that BASF would be responsible for severance obligations incurred pursuant to Chemdal's severance policies after the closing manifests the parties' intent to benefit transferred employees, such as themselves. Pls.' Resp. at 5 (citing Compl., Ex. A § 6.02). Defendant argues the parties expressly disclaimed third-party beneficiary status and cites to a provision in the Purchase Agreement entitled "Third Party Beneficiaries," which provides:

> Except for the provisions of Article IX and Article VII relating to Indemnified Parties, (a) the provisions of this Agreement are solely for the benefit of the parties and are not intended to confer upon any Person except the parties any rights or remedies hereunder and (b) there are no third party beneficiaries of this Agreement and this Agreement shall not provide any third Person with any remedy, claim, liability, reimbursement, claim of action or other right in excess of those existing without reference to this Agreement.

*See* Compl., Ex. A § 11.08. The court concludes that the clear import of this provision is that, other than the types of third-party claims for which indemnification is provided under Articles IX and VII, there are no third-party beneficiaries to the Purchase Agreement. *See Golden,* 53 F.3d at 870 (" The contract at issue here expressly states that it confers no rights on any party not a party to the contract."). Plaintiffs do not contend, nor do the allegations of the complaint suggest, that their claims conform to the types of third-party claims for which indemnification is provided under Articles IX FN2 and VII. FN3 Instead, plaintiffs assert that the disclaimer provision does not bar but, rather, supports their claims, explaining that the last clause-"this Agreement shall not provide any third Person with any claim ... *in excess of those existing without reference to this Agreement* "-means that third parties would have no rights greater than those existing by virtue of the Agreement. Pls.' Resp. at 1, 5. In other words, they argue that because their claims are dependent on the Purchase Agreement, they are permitted. FN4 Plaintiffs' reading is contrary to the plain meaning of the language. The phrase could only be read as plaintiffs contend if the words "in excess of those existing" were read out of the phrase. Such a reading, however, would depart from the rule of contract construction that requires

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                           Page 4

Not Reported in F.Supp.2d, 2001 WL 1035211
(Cite as: Not Reported in F.Supp.2d)

the court to, if possible, give effect to all of the contract's words. *See Bank of Am. Nat'l Trust and Sav. Ass'n v. Schulson,* 714 N.E.2d 20, 24 (Ill.App.Ct.1999) (citing, *inter alia, Martindell v. Lake Shore National Bank,* 154 N.E.2d 683 (Ill.1958)). Reading the phrase as a whole, the court concludes that the plain meaning is that a third party has only those remedies he would have if the Purchase Agreement did *not* exist. That is, the parties did not intend that the Purchase Agreement provide an independent basis of liability to third parties. Therefore, the court dismisses Counts I and II for failure to adequately allege breach of contract claims as third-party beneficiaries under the Purchase Agreement.

> FN2. Article IX provides that AMCOL agrees to indemnify BASF AG or its affiliates for
> any and all Liabilities or Losses suffered or incurred by the Purchaser or [Chemdal] ... or the SAP Business, including by reason of or in connection with any claim or cause of action of any third party, to the extent arising out of any action, inaction, event, condition, liability or obligation of [Chemdal] ..., the Sellers or the SAP Business occurring or existing prior to the Closing, but only to the extent that the existence of such Liability or Loss constitutes a breach by the Sellers of their representations and warranties in this Agreement; ....
> Compl., Ex. A § 9.02(v). Article IX also provides that BASF AG agrees to indemnify AMCOL or its affiliates for
> any claim arising out of the employment or discharge at any time on or after the Closing Date by the Purchaser [or Chemdal] ..., of any employee listed on Section 6.01 of the Disclosure Schedule and Section 6.08 of the Disclosure Schedule attached hereto or otherwise, including, without limitation, any failure by the Purchaser to satisfy its obligations under Article 6 hereof, and any severance amounts payable to such employees arising as a result of his or her discharge or termination of employment by the Purchaser [or Chemdal] ..., following the Closing Date; ....
> *Id.* at § 9.03(v). While section 9.03(v) contemplates indemnification for BASF AG's failure to satisfy severance obligations under Article 6, it does so with respect to claims against AMCOL or its affiliates, for which AMCOL in turn could seek indemnification from BASF AG. Plaintiffs (even assuming they were included in the specified sections of the Disclosure Schedule) have not sued AMCOL or its affiliates, but have sued BASF.

FN3. Article VII deals with tax matters.

FN4. None of the cases cited by plaintiffs involved an express disclaimer. *See Moriarty v. Hills Funeral Home, Ltd.,* 93 F.Supp.2d 910 (N.D.Ill.2000), *rev'd,* 256 F.3d 554 (7th Cir.2001) ; *Brown v. Keystone Consol. Indus.,* 680 F.Supp. 1212 (N.D.Ill.1988) ; *Grazier v. Davy Dravo Div.,* 1991 WL 432053 (W.D.Pa. Feb. 11, 1992).

Illinois Wage Payment and Collection Act Claim

*4 Defendant next moves to dismiss Count III brought on behalf of plaintiff Donald Anderson pursuant to IWPCA, 820 ILCS 115/5. Section 5 of IWPCA requires an employer to make a final compensation payment to any separated employee no later than the employee's next regular pay day and requires that

> whenever a contract of employment or employment policy provides for paid vacation, and an employee resigns or is terminated without having taken all vacation time earned in accordance with such contract of employment or employment policy, the monetary equivalent of all earned vacation shall be paid to him or her as part of his or her final compensation at his or her final rate of pay[.]

820 ILCS 115/5. Defendant argues that plaintiff fails to allege an employment contract or policy providing for paid vacations, and fails to allege that

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                  Page 5

Not Reported in F.Supp.2d, 2001 WL 1035211
(Cite as: Not Reported in F.Supp.2d)

plaintiff earned the additional five days of vacation in accordance with such contract or policy. Plaintiff responds that he does not know how BASF calculated and allocated vacation days to the transferred employees, such as himself, and knows only what was included in the Purchase Agreement and verbally represented to him after the sale. The provisions of the Purchase Agreement to which plaintiff refers provide that the "Purchaser shall provide ... Transferred Employees ... with paid vacation time ... for all vacation earned and unpaid through the Closing Date," Compl., Ex. A § 6.03(d), and "[f]or a period of one year after the Closing Date, the Purchaser shall provide the Transferred Employees ... with a level of employee benefit plans ... substantially comparable ... to the level of employee benefits provided to similar [sic] situated employees of the Purchaser." *Id.* at § 6.03(a). Plaintiff also asserts that after the closing BASF verbally told him that he would receive 40 days of vacation pay.

Although the provisions of the Purchase Agreement do not constitute the employment contract or policy regarding vacation pay, FN5 one could infer from the allegations in the complaint that BASF had an agreement or policy providing for paid vacations, that the agreement or policy was applicable to plaintiff, and that plaintiff earned in accordance with that agreement or policy, the vacation time he seeks. Namely, plaintiff was a BASF employee after the closing, and, shortly after the closing, BASF's Halbfoster specifically told him that "he had 40 days of vacation pay as a result of the merger." Compl. ¶¶ 25, 38. Subsequently, after BASF terminated him, his final compensation included the monetary equivalent of accrued vacation pay, and BASF paid him for 35 of those 40 days. *Id.* at ¶¶ 37, 39. Indeed, BASF concedes that it paid plaintiff 35 days of accrued vacation time upon his separation. *See* Def.'s Reply, at 6 n. 3. Presumably, in order to pay out any vacation time to plaintiff, BASF did so pursuant to a policy or agreement providing for such paid vacations that was applicable to plaintiff. Moreover, merely because plaintiff was provided conflicting information as to the amount of paid vacation to which he was entitled, does not mean he cannot prove that he actually earned the additional five days of vacation time in accordance with the BASF policy or agreement. If Halbfoster's statement that he was entitled to 40 days is true, then presumably plaintiff earned those days, and did so in accordance with the BASF policy or agreement. Therefore, the court denies BASF's motion to dismiss Count III.

> FN5. Any third-party claim for vacation pay is barred by the express disclaimers in the Purchase Agreement. *See* Compl., Ex. A §§ 6.03(e), 11.08.

II. Defendant's Motion to Strike Allegations in Counts IV and V

*5 Defendant asks the court to strike several allegations of plaintiffs' COBRA claims in Counts IV and V. On a motion to strike made pursuant to Federal Rule of Civil Procedure 12(f) "the court may order stricken from any pleading ... any redundant, immaterial, impertinent, or scandalous matter." Fed.R.Civ.P. 12(f). The court generally disfavors motions to strike, *WTM, Inc. v. Henneck*, 125 F.Supp.2d 864, 869 (N.D.Ill.2000), and should strike portions of the complaint only if "the language in the pleading has no relation to the controversy and is unduly prejudicial." *Circuit Sys., Inc. v. Mescalero Sales, Inc.*, 925 F.Supp. 546, 548 (N.D.Ill.1996) (citation omitted).

Defendant first asks the court to strike plaintiffs' request to fine BASF under the Internal Revenue Code arguing that plaintiffs lack standing to pursue such fines and to strike plaintiffs' request to compel BASF to offer plaintiffs retroactive coverage to the date of their terminations arguing that plaintiffs already received such an offer. Plaintiffs agree and have withdrawn their request for such relief. Pls.' Resp. at 3 n. 1, 9. Therefore, the court strikes plaintiffs' requests in Counts IV and V for fines under the Internal Revenue Code and for an offer of retroactive coverage.

Defendant next asks the court, assuming the court has dismissed Counts I and II, to strike paragraphs 41 and 47 of the complaint, as irrelevant to Counts IV and V and burdensome to the court and BASF. Paragraph 41 in Count IV (Mark Anderson's

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                    Page 6

Not Reported in F.Supp.2d, 2001 WL 1035211
**(Cite as: Not Reported in F.Supp.2d)**

COBRA claim) realleges paragraphs 1-14 and 16-23 of the complaint. Paragraph 47 in Count V (Donald Anderson's COBRA claim) realleges paragraphs 1-14 and paragraphs 25-34. The court declines to strike these allegations. In the first instance, paragraphs 1-14 and 25-34 remain in the complaint pursuant to paragraph 35 in Count III, which this court has not dismissed. Given that defendant will be answering these allegations, to have defendant further answer the allegations in paragraphs 16-23 (those realleging facts contained in Mark Anderson's breach of contract complaint in Count IV) will not significantly burden the record or BASF. Moreover, both parties agree that, at the least, in order for plaintiffs to prove their COBRA claims, they must establish a "qualifying event." Plaintiffs have asserted that their terminations constitute qualifying events. Although there are some allegations regarding Mark Anderson's termination in Count IV, defendant has not persuaded the court that any of the allegations in paragraphs 16-23 will have no relation to plaintiff's COBRA claim. Therefore, the court denies the motion to strike paragraphs 41 and 47 of the complaint.

## CONCLUSION

For the reasons explained above, the grants defendant's motion to dismiss [# 9-1] as to Counts I and II without prejudice, but denies the motion as to Count III. The court also grants in part and denies in part defendant's motion to strike portions of Counts IV and V [# 9-2], as set forth above. Plaintiffs are to file an amended complaint by September 26, 2001.

N.D.Ill.,2001.
Anderson v. BASF Corp.
Not Reported in F.Supp.2d, 2001 WL 1035211

Briefs and Other Related Documents (Back to top)

• 2001 WL 34706696 (Trial Pleading) Defendant's Answer and Affirmative Defense to Plaintiffs' Amended Complaint (Oct. 16, 2001)
• 2001 WL 34706693 (Trial Pleading) Amended Complaint (Sep. 26, 2001)

• 2000 WL 34464927 (Trial Pleading) Complaint (Oct. 31, 2000)
• 1:00CV06804 (Docket) (Oct. 31, 2000)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.