# Exhibit B
## (part 1 of 2)

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

*F I L E D*

*FEB - 7 2005*

*MICHAEL W. DOBBINS*
*CLERK, U.S. DISTRICT COURT*

| | | |
|---|---|---|
| BUSINESS SYSTEMS ENGINEERING, INC. | ) | |
| | ) | |
| Plaintiff, | ) | Case No.  04 C 8254 |
| v. | ) | |
| | ) | Judge Elaine E. Bucklo |
| INTERNATIONAL BUSINESS MACHINES | ) | |
| CORPORATION ("IBM"), | ) | Magistrate Judge Arlander Keyes |
| | ) | |
| Defendant. | ) | |

## IBM'S MOTION TO DISMISS

IBM hereby moves to dismiss plaintiff Business Systems Engineering, Inc.'s

("BSE") complaint, pursuant to Fed. R. Civ. P. 12(b)(6).  In support of its motion, IBM states as

follows:

1.       IBM was retained by the Chicago Transit Authority ("CTA") to assist the

CTA with its implementation of a new computer system.  BSE was one of IBM's subcontractors

on the project.  BSE asserts a breach of contract claim, alleging that IBM failed to pay BSE a

"targeted $3.6 million" for its participation in the CTA project.  Cmplt. ¶ 12.  BSE also alleges

that IBM tortiously interfered with a contract between BSE and one of its independent

contractors, Maureen Jones.  Cmplt. ¶¶ 13-18.  Finally, BSE alleges that, because IBM failed to

sufficiently use BSE on the project, IBM tortiously interfered with BSE's prospects of doing

business with the CTA in the future.  Cmplt. ¶¶ 19-26.  For the reasons discussed below, BSE

has failed to state a claim upon which relief may be granted.

2.       BSE's First Cause of Action is for breach of contract.  Because the

documents on which BSE bases its claim, on their face, are not contracts, the claim must be

63420v3

dismissed. The documents on which BSE relies are merely letters of intent, which evidence the

parties' anticipation of a future executed contract. They are not, however, contracts themselves.

*See, e.g., Venture Assoc. Corp. v. Zenith Data Sys. Corp.*, 987 F.2d 429, 432-33 (7th Cir. 1993)

(letter of intent contemplating "the preparation and execution of a mutually satisfactory Purchase

Agreement" clearly evidenced an intent to *not* be bound until execution of the formal contract).

3.       In addition, BSE's breach of contract claim must be dismissed because the

letters of intent lack nearly all essential commercial terms and, therefore, are too indefinite for

this Court to enforce. *See Reese v. Forsythe Mergers Group, Inc.*, 288 Ill. App. 3d 972, 980, 682

N.E.2d 208, 214 (2d Dist. 1997) (to be enforceable, plaintiff must provide enough information

for the court to be able to ascertain whether the agreement has been breached); *O'Neil & Santa*

*Claus, Ltd. v. Xtra Value Imports, Inc.*, 51 Ill. App. 3d 11, 14, 365 N.E.2d 316, 318 (3d Dist.

1977) (no contract where plaintiff did not establish duration of contractual relationship, extent of

services to be performed or payment terms).

4.       BSE's Second Cause of Action for tortious interference with contract must

be dismissed because BSE fails to allege four of the five elements of the claim. First, although

BSE bases its claim on IBM's alleged failure to approve Maureen Jones to work on the CTA

project, BSE does not allege that it had a contract with Ms. Jones or that IBM had knowledge of

such a contract. *See Indeck N. Amer. Power Fund v. Norweb*, 316 Ill. App. 3d. 416, 431, 735

N.E.2d 649, 661 (1st Dist. 2000) (dismissing tortious interference claim where no valid contract

was alleged); *Air Exch. v. BCI Aircraft Leasing*, No. 00 C 2551, 2001 WL 185475, at *4 (N.D.

Ill. Feb. 26, 2001) (claim dismissed where defendant's knowledge of contract not plead).

Second, BSE does not allege that IBM directed any conduct towards Ms. Jones with the intent to

induce her to breach a contract with BSE. *See, e.g., Straka v. Francis*, 867 F. Supp. 767, 776

63420v3

(N.D. Ill. 1994) (claim dismissed where intent not pled); *see also Mitchell v. Weiger*, 87 Ill. App.

3d 302, 305, 409 N.E.2d 38, 41 (1st Dist. 1980) (claim dismissed where no inducement of third

party pled because defendant's alleged actions were directed at plaintiff). Third, BSE does not

contend that Ms. Jones breached any agreement with it. For each of these reasons, BSE's

Second Cause of Action must be dismissed.

     5.    BSE's Third and Fourth Causes of Action for tortious interference with

prospective economic advantage fail as well. Most notably, BSE does not allege a valid business

expectancy. BSE alleges nothing more than a hope that its work on the CTA project would lead

to future engagements with the CTA. As a matter of Illinois law, a "mere hope" of future work

does not constitute a valid expectancy. *Anderson v. Vanden Dorpel*, 172 Ill. 2d 399, 407-08, 667

N.E.2d 1296, 1299 (1996) (mere hope of employment is not a valid business expectancy as a

matter of law). In addition, BSE fails to allege that IBM intentionally directed any conduct

towards a third party with the intent to interfere. *George Fuller Co., A Div. of Northrop Corp. v.*

*Chicago Coll. of Osteopathic Med.*, 719 F.2d 1326, 1331-32 (7th Cir. 1983) (dismissing tortious

interference with prospective economic advantage claim where defendant's actions were directed

toward the plaintiff, not a third party). Finally, because BSE alleges that IBM and BSE were

competitors (Cmplt. ¶ 25), BSE was required to allege that IBM acted with malice. *See Indeck*,

316 Ill. App. 3d. at 431. It did not do so.

     6.    IBM submits herewith a Memorandum of Law Supporting Its Motion

Dismiss, which is incorporated herein by this reference.

     WHEREFORE, IBM respectfully requests that the Court enter an order

dismissing BSE's complaint with prejudice pursuant to Fed. R. Civ. P. 12(b)(6).

-3-

63420v3

Dated:  February 7, 2005                    Respectfully submitted,

                                            INTERNATIONAL BUSINESS MACHINES
                                            CORPORATION


                                            One of Its Attorneys

Todd C. Jacobs
Gary M. Miller
Amanda H. McMurtrie
GRIPPO & ELDEN LLC
227 West Monroe Street, Suite 3600
Chicago, IL 60606
phone: (312) 704-7700
fax: (312) 558-1195

-4-

63420v3

## CERTIFICATE OF SERVICE

The undersigned, an attorney, hereby certifies that a true and correct copy of **NOTICE OF MOTION, IBM'S MOTION TO DISMISS, MEMORANDUM IN SUPPORT OF IBM'S MOTION TO DISMISS** and **APPENDIX OF WESTLAW AUTHORITIES CITED IN IBM'S MEMORANDUM SUPPORTING ITS MOTION TO DISMISS** were sent via messenger this 7th day of February, 2005 to: Arthur S. Gold, GOLD & COULSON, a Partnership of Professional and Limited Liability Corporations, 11 S. LaSalle Street, Suite 2402, Chicago, Illinois 60603.

63676v1



IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

*F I L E D*

*FEB - 7 2005*

*MICHAEL W. DOBBINS*
*CLERK, U.S. DISTRICT COURT*

BUSINESS SYSTEMS ENGINEERING, INC.    )
                                      )
                          Plaintiff,  )    Case No. 04 C 8254
          v.                          )
                                      )    Judge Elaine E. Bucklo
INTERNATIONAL BUSINESS MACHINES       )
CORPORATION ("IBM"),                  )    Magistrate Judge Arlander Keyes
                                      )
                          Defendant.  )


## IBM'S MEMORANDUM OF LAW
## SUPPORTING ITS MOTION TO DISMISS


Todd C. Jacobs
Gary M. Miller
Amanda H. McMurtrie
GRIPPO & ELDEN LLC
227 West Monroe Street, Suite 3600
Chicago, Illinois 60606
Phone: (312) 704-7700
Fax: (312) 558-1195

*Counsel for Defendant International*
*Business Machines Corporation*

60945v8

## TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................................... i

TABLE OF AUTHORITIES .............................................................................................ii

INTRODUCTION ............................................................................................................1

ALLEGATIONS OF THE COMPLAINT..........................................................................2

ARGUMENT ...................................................................................................................4

I.  BSE's Claim For Breach Of Contract Must Be Dismissed Because the Documents On
Which BSE Bases Its Claim Are Not Contracts (Count I). ........................................5

   A. The letters of intent on which BSE relies are not contracts. ...............................5

   B. The letters of intent also lack material terms essential to an enforceable contract............ 8

II. BSE Has Not Alleged The Elements Required To State A Claim For Tortious
Interference With Contract (Count II). .....................................................................9

   A. BSE fails to allege that it had a contract with Maureen Jones...........................9

   B. BSE fails to allege that IBM was aware of a contract between BSE and Ms. Jones........ 10

   C. BSE fails to allege that IBM acted intentionally or directed its actions toward a
      third person. ..................................................................................................... 10

   D. BSE fails to allege that Ms. Jones breached a contract with BSE. ...................11

III. BSE's Claims For Tortious Interference With Prospective Economic Advantage Fail
Because BSE Has Not Alleged A Valid Business Expectancy Or Tortious Conduct
(Counts III-IV)........................................................................................................12

   A. BSE does not allege a valid business expectancy...........................................12

   B. BSE does not allege that IBM engaged in intentional conduct directed toward a
      third party........................................................................................................ 14

   C. BSE does not allege that IBM acted with malice. .........................................15

CONCLUSION...............................................................................................................15

60945v8

## TABLE OF AUTHORITIES

**Cases**

*Air Exch. v. BCI Aircraft Leasing,*
  No. 00 C 2551, 2001 WL 185475 (N.D. Ill. Feb. 26, 2001)........................................................ 10

*Alfieri v. CSX Corp.,*
  201 Ill. App. 3d 559, 559 N.E.2d 166 (1st Dist. 1990)............................................................... 12

*Anderson v. Vanden Dorpel,*
  172 Ill. 2d 399, 667 N.E.2d 1296 (1996)................................................................... 12, 13, 14

*Bass v. SMG, Inc.,*
  328 Ill. App. 3d 492, 765 N.E.2d 1079 (1st Dist. 2002)............................................................... 14

*Candalaus Chicago, Inc. v. Evans Mill Supply Co.,*
  51 Ill. App. 3d 38, 366 N.E.2d 319 (1st Dist. 1977)................................................................... 15

*Classic Fire & Marine Ins. Co. v. Illinois Ins. Exch.,*
  No. 97 C 1256, 1997 WL 767290 (N.D. Ill. Dec. 3, 1997) ...................................................... 5, 8

*Douglas Theater Corp. v. Chicago Title & Trust Co.,*
  288 Ill. App. 3d 880, 681 N.E.2d 564 (1st Dist. 1997)............................................................... 14

*Emergency Care and Health Org., LTD. v. Trinity Med. Ctr.,*
  No. 93 L 129, 2003 WL 23492323 (Ill. Cir. Nov. 17, 2003)...................................................... 6

*Empro Mfg. Co., Inc. v. Ball-Co Mfg., Inc.,*
  870 F.2d 423 (7th Cir. 1989) ...................................................................................................... 7

*George A. Fuller Co., A Div. of Northrop Corp. v. Chicago Coll. of Osteopathic Med.,*
  719 F.2d 1326 (7th Cir. 1983) ............................................................................................ 11, 14

*Gomez v. Illinois State Bd. of Educ.,*
  811 F.2d 1030 (7th Cir. 1987) ................................................................................................ 2, 4

*Graue Mill Dev. Corp. v. Colonial Bank & Trust Co. of Chicago,*
  927 F.2d 988 (7th Cir. 1991) ...................................................................................................... 5

*HPI Health Care Serv., Inc. v. Mt. Vernon Hosp., Inc.,*
  131 Ill. 2d 145, 545 N.E.2d 672 (1989)........................................................................................ 9

*Illinois Bell Tel. Co. v. Plote, Inc.,*
  334 Ill. App. 3d 796, 778 N.E.2d 1203 (1st Dist. 2002)............................................................. 10

*In re Wade,*
  969 F.2d 241 (7th Cir. 1992) ...................................................................................................... 5

*Indeck N. Amer. Power Fund, L.P. v. Norweb,*
  316 Ill. App. 3d 416, 735 N.E.2d 649 (1st Dist. 2000)......................................................... 10, 15

*LaSalle Nat'l Bank v. Vega,*
  167 Ill. App. 3d 154, 520 N.E.2d 1129 (2nd Dist. 1988)............................................................. 6

-ii-

*Lashbrook v. Oerkfitz*,
  65 F.3d 1339 (7th Cir. 1995) ................................................................................ 5

*Lucien v. Preiner*,
  967 F.2d 1166 (7th Cir. 1992) ........................................................................... 4, 6

*Miller-Calabrese v. Continental Grain Co.*,
  No. 96 C 6626, 1997 WL 392340 (N.D. Ill. July 8, 1997) ..................................... 10

*Mitchell v. Weiger*,
  87 Ill. App. 3d 302, 409 N.E.2d 38 (1st Dist. 1980).............................................. 11

*Moskowitz v. City of Chicago*,
  No. 93 C 1335, 1993 WL 478938 (N.D. Ill. Nov. 16, 1993)................................... 10

*Northern Indiana Gun & Outdoor Shows, Inc. v. City of South Bend*,
  163 F.3d 449 (7th Cir. 1998) ................................................................................ 5

*O'Neil & Santa Claus, Ltd. v. Xtra Value Imports, Inc.*,
  51 Ill. App. 3d 11, 365 N.E.2d 316 (3d Dist. 1977) ............................................ 8, 9

*Ocean Atl. Dev. Corp. v. Aurora Christian Sch., Inc.*,
  322 F.3d 983 (7th Cir. 2002) .:.......................................................................... 6, 8

*Ogle v. Hotto*,
  273 Ill. App. 3d 313, 652 N.E.2d 815 (5th Dist. 1995) ............................................ 5

*Presley v. P&S Grain Co., Inc.*,
  289 Ill. App. 3d 453, 683 N.E.2d 901 (5th Dist. 1997) ............................................ 5

*Reese v. Forsythe Mergers Group, Inc.*,
  288 Ill. App. 3d 972, 682 N.E.2d 208 (2d Dist. 1997) ......................................... 8, 9

*Senese v. Climatemp, Inc.*,
  222 Ill. App. 3d 302, 582 N.E.2d 1180 (1st Dist. 1991)............................................ 7

*Straka v. Francis*,
  867 F. Supp. 767 (N.D. Ill. 1994) ........................................................................ 10

*Talbert v. Home Sav. of Amer., F.A.*,
  265 Ill. App. 3d 376, 638 N.E.2d 354 (1st Dist. 1994)........................................... 5, 6

*Thompson v. Illinois Dept. of Prof'l Regulation*,
  300 F.3d 750 (7th Cir. 2002) ................................................................................ 4

*Titchener v. Avery Coonley Sch.*,
  39 Ill. App. 3d 871, 350 N.E.2d 502 (2d Dist. 1976) ............................................. 12

*Venture Assoc. Corp. v. Zenith Data Sys. Corp.*,
  987 F.2d 429 (7th Cir. 1993) ................................................................................ 7

*Werblood v. Columbia Coll.*,
  180 Ill. App. 3d 967, 536 N.E.2d 750 (1st Dist. 1989).................................. 12, 13, 14

*Williams v. Weaver*,
  145 Ill. App. 3d 562, 495 N.E.2d 1147 (1st Dist. 1986)........................... 12, 13, 14, 15

-iii-

**Rules**

Fed. R. Civ. P. 12(b)(6)...................................................................................................... 4

60945v8

**INTRODUCTION**

IBM was engaged by the Chicago Transit Authority ("CTA") to assist the CTA with its implementation of a new computer system. Plaintiff Business Systems Engineering, Inc. ("BSE") worked on the CTA project as an IBM subcontractor. BSE alleges in this suit that IBM breached its contract with BSE by failing to provide BSE with $3.6 million worth of work on the CTA project. BSE also contends that IBM tortiously interfered with a contract between BSE and an independent contractor and that, by failing to fully use BSE on the project, IBM tortiously interfered with BSE's prospects of doing business with the CTA in the future. For the reasons discussed below, each of BSE's claims is deficient as a matter of law and its complaint should be dismissed in its entirety.

BSE's lead count for breach of contract fails for the fundamental reason that the documents on which BSE bases its claim, on their face, are not contracts. Exhibits 2 and 3 to the complaint--the documents on which BSE relies--are letters of intent in which BSE expressed an intention to "enter into a formal written agreement" with IBM upon execution of a contract between the CTA and IBM. These letters anticipate future execution of a contract, but they are not contracts themselves. IBM and BSE did subsequently enter into contracts (a Customer Solutions Agreement and multiple Statements of Work) in connection with the CTA project, but (as BSE surely knows) those contracts did not, either individually or in the aggregate, require IBM to use BSE for $3.6 million worth of work on the project. Moreover, the letters of intent BSE attaches to its complaint are lacking essential terms necessary to an enforceable contract. The letters do not provide any explanation as to what services BSE is to provide, when these services are to be provided or when IBM is required to pay for BSE's services. Without these terms (and others), there is no contract as a matter of law. Because the documents on which BSE bases its contract claim are not contracts, Count I must be dismissed. *See* § I, below.

60945v8

BSE's claim for tortious interference with contract (Count II) fares no better. Indeed, BSE fails to allege four of the five required elements: BSE does not claim that it had a contract with a third party; that IBM had any knowledge of the supposed contract; that IBM intentionally induced anyone to breach a contract; or that a third party breached its contract with BSE. *See* § II, below.

Finally, BSE's claims for tortious interference with prospective economic advantage (Counts III and IV) are also legally deficient. BSE does not allege a valid business expectancy to which any legal interest attaches. BSE alleges nothing more than a hope that it would do work for the CTA at some point in the future. Under a long line of Illinois cases, a mere hope of future business does not constitute a valid expectancy. BSE also fails to allege that IBM intentionally and maliciously induced a third party to terminate a relationship with BSE. Without these required elements, BSE has no claim for relief. *See* § III, below.

## ALLEGATIONS OF THE COMPLAINT[1]

In December 2001, IBM and the CTA entered into a contract, pursuant to which IBM agreed to assist the CTA with its implementation of a new computer system. Cmplt. ¶¶ 6-7 and Ex. 1. BSE was approved as a subcontractor on the project. Cmplt., Ex. 1 at Ex. I. BSE's role was to recruit consultants, or "resources," and present these resources to IBM for use on the project. Cmplt. ¶ 11. BSE agreed to not hire any resource unless interviewed and approved by IBM. *Id.*

BSE alleges that, on November 14, 2000, IBM and BSE "entered into attached Exhibit 2," which BSE describes as "a sub-contract for $8,560,000." Cmplt. ¶ 8. That exhibit, however (which was actually attached as Exhibit 3), on its face, is not a contract. Exhibit 3 is a letter of intent signed by Nathan Paige, BSE's former CEO. The letter is not signed by any representative of IBM. In the letter, BSE expressed an intent to "***enter into a formal written***

---

[1] BSE's allegations are accepted as true for purposes of this motion only. *See Gomez v. Illinois State Bd. of Educ.*, 811 F.2d 1030, 1039 (7th Cir. 1987).

G0945v8

*agreement*" with IBM as the prime contractor in the event that IBM entered into a contract with the CTA. Cmplt., Ex. 3 (emphasis supplied). Whether BSE and IBM would enter into a contract was therefore contingent on (1) IBM and CTA finalizing and executing their contract and (2) IBM and BSE agreeing on the terms of "a formal written agreement." The letter of intent provides no description of (a) the work to be provided by BSE (other than "services"), (b) the timeframe in which the work is to be performed or (c) any other commercial terms one would expect to see in a multi-million dollar contract.

BSE claims that the parties later modified this alleged agreement by reducing the dollar amount to $3.6 million and that the modified agreement is attached to its complaint as Exhibit 3 (the document is actually attached as Exhibit 2). Cmplt. ¶¶ 9-10. This document is also a letter of intent and, like the first letter, it too is executed by BSE's Nathan Paige but not by IBM. *Id.* at Ex. 2. In the letter, BSE represents that it is "prepared to provide" its services for the CTA project and "*will enter into a formal written agreement*" with IBM after IBM signs a contract with the CTA. *Id.* (emphasis supplied).[2]

BSE alleges that IBM breached its "contract" with BSE by only providing BSE with $2.2 million worth of work on the project, rather than "the targeted $3.6 million in participation [on the project]." Cmplt. ¶ 12.

BSE also asserts a claim for tortious interference with contract based on IBM's alleged failure to approve a BSE resource, Maureen Jones, to work on the project. Cmplt. ¶¶ 13-18. BSE does not allege, however, that it had a contract with Ms. Jones. To the contrary, BSE claims that it could not hire any resource without "IBM's approval." Cmplt. ¶ 11. Given that

---

[2] BSE's complaint is most noteworthy for what it omits. IBM and BSE *did* enter into a formal written contract after IBM signed its agreement with the CTA. That contract, called the Customer Solutions Agreement, contains the warranty, indemnity and payment terms generally found in business agreements. The parties later entered into multiple Statements of Work, one for each BSE resource on the project. *BSE does not discuss or attach any of the actual contracts between IBM and BSE, likely because these contracts do not in any way obligate IBM to provide BSE with $3.6 million worth of work on the project.* Should the Court grant BSE leave to replead, it should order BSE to attach and rely on the actual contracts entered into between the parties, not letters of intent signed by BSE only.

60945 v8

Ms. Jones was not approved by IBM, BSE (according to its own allegations) could not have entered into a contract with her. BSE also does not allege that (a) IBM had knowledge of a contract between BSE and Ms. Jones, (b) IBM intentionally induced Ms. Jones to breach any contract with BSE or (c) Ms. Jones breached a contract with BSE. *See* Cmplt. ¶¶ 13-18.

BSE's final claims are for tortious interference with prospective economic advantage. *Id.* at ¶¶ 19-26. BSE alleges that it had hoped its involvement in the CTA project would lead to other work for the CTA in the future, and because IBM did not use BSE sufficiently on the project, that hurt BSE's chances. *Id.* BSE claims IBM did so because it knew BSE "would have competed with IBM" for the future CTA work. *Id.* ¶ 25. BSE does not contend that it had an agreement in principal with the CTA for future work or even that it was in negotiations with the CTA, only that there was a "potential for BSE to further service the CTA after the completion of the [IBM] project." *Id.* ¶ 26.

**ARGUMENT**

A complaint should be dismissed under Fed. R. Civ. P. 12(b)(6) if its allegations fail to state a claim upon which relief can be granted. *Gomez*, 811 F.2d at 1039. Thus, to survive a motion to dismiss, a plaintiff must allege every element of a claim. *See Lucien v. Preiner*, 967 F.2d 1166, 1167 (7th Cir. 1992). The Court need not consider conclusory statements of fact or law as support for a claim. *See id.*

When analyzing a motion to dismiss, the Court must consider any exhibits attached to the complaint. *Thompson v. Illinois Dept. of Prof'l Regulation*, 300 F.3d 750, 754 (7th Cir. 2002). Indeed, under well-established Seventh Circuit authority, in situations (like here) in which complaint allegations conflict with complaint exhibits, the exhibits control. *E.g.*, *Northern Indiana Gun & Outdoor Shows, Inc. v. City of South Bend*, 163 F.3d 449, 454-55 (7th

-4-

60945v8

Cir. 1998); *In re Wade*, 969 F.2d 241, 249 (7th Cir. 1992); *Graue Mill Dev. Corp. v. Colonial Bank & Trust Co. of Chicago*, 927 F.2d 988, 991 (7th Cir. 1991).[3]

**I.    BSE's Claim For Breach Of Contract Must Be Dismissed Because the Documents On Which BSE Bases Its Claim Are Not Contracts (Count I).**

To state a claim for breach of contract, a plaintiff must allege that (a) a valid and enforceable contract exists; (b) the plaintiff performed its obligations under the contract; (c) the defendant breached the contract; and (d) the plaintiff suffered damages as a result of the breach. *Talbert v. Home Sav. of Amer., F.A.*, 265 Ill. App. 3d 376, 379, 638 N.E.2d 354, 357 (1st Dist. 1994). To be valid, the document on which a plaintiff bases its claim must evidence (a) competent parties, (b) valid subject matter, (c) adequate consideration and (d) mutuality of agreement. *Presley v. P&S Grain Co., Inc.*, 289 Ill. App. 3d 453, 464, 683 N.E.2d 901, 910 (5th Dist. 1997). The contract must also contain terms that are sufficiently definite and certain so that the court may ascertain the parties' agreement. *E.g., Classic Fire & Marine Ins. Co. v. Illinois Ins. Exch.*, No. 97 C 1256, 1997 WL 767290, at *4 (N.D. Ill. Dec. 3, 1997).

BSE's claim for breach of contract fails because (1) the documents on which BSE relies, on their face, are not contracts and (2) the purported "contracts" lack material terms essential to the formation of a binding agreement.

**A.    The letters of intent on which BSE relies are not contracts.**

A plaintiff suing for breach of contract cannot overcome a motion to dismiss simply by alleging that a document attached to its complaint constitutes a valid contract. *Lashbrook v. Oerkfitz*, 65 F.3d 1339, 1346-47 (7th Cir. 1995) (personnel manual not a contract on its face despite plaintiff's claim that it created "protected property interest"); *Ogle v. Hotto*, 273 Ill. App. 3d 313, 319-20, 652 N.E.2d 815, 818-19 (5th Dist. 1995) (dismissing contract claim

---

[3] In this motion, IBM analyzes BSE's claims under Illinois law. We note, however, that the IBM Customer Solutions Agreement, which BSE executed but chose not to attach to its complaint, contains a New York choice of law clause.

where document attached to complaint was not a contract); *Emergency Care and Health Org., LTD. v. Trinity Med. Ctr.*, No. 93 L 129, 2003 WL 23492323, at *1 (Ill. Cir. Nov. 17, 2003) (complaint exhibit not a contract, notwithstanding plaintiff's repeated allegations to the contrary; "A rose by any other name, etc . . . Exhibit A is neither a contract nor an agreement . . . calling it a 'Preliminary Agreement' won't resuscitate it").

A plaintiff's allegation that a document is a contract is merely a legal conclusion, not to be considered when deciding a motion to dismiss. *See Talbert*, 265 Ill. App. 3d at 380, 638 N.E.2d at 357 (court need not consider conclusions of law when deciding a motion to dismiss); *see also Lucien*, 967 F.2d at 1167 (same). Instead, the Court must review the terms of the document attached to the complaint to determine if it is a contract or not. *See LaSalle Nat'l Bank v. Vega*, 167 Ill. App. 3d 154, 159-60, 520 N.E.2d 1129, 1132 (2nd Dist. 1988) (a plaintiff's claim for breach of contract is based on the document it attaches to its complaint; not its characterization of that document).

Letters of intent like those on which BSE relies are not enforceable contracts. For example, in *Ocean Atl. Dev. Corp. v. Aurora Christian Sch., Inc.*, 322 F.3d 983 (7th Cir. 2002), the Seventh Circuit affirmed a decision by Chief Judge Kocoras that a letter between the parties did not constitute an enforceable contract because, as in this case, (a) "the terms of the letter rendered the agreement . . . contingent upon the execution of a formalized contract" and (b) the letter "omit[ted] terms one would expect to find in a multi-million dollar contract." *Id.* at 989, 999. The reasoning in *Ocean Atlantic* is directly on point:

> As we recognized in *Empro Mfg. Co. v. Ball-Co Mfg., Inc.*, 870 F.2d 423, 424 (7th Cir. 1989), it is a common commercial practice for two negotiating parties to sign a letter of intent or an agreement in principal, signaling that they have come to a tentative agreement on the general outlines of a deal without having nailed down all of the details. Not infrequently, the negotiations that follow the execution of this document break down, prompting the disappointed party to sue on the theory that the preliminary document is binding . . . As we went on to hold, *a letter of intent or a similar preliminary writing that reflects a tentative*

-6-

> *agreement contingent upon the successful completion of
> negotiations that are ongoing, does not amount to a contract that
> binds the parties. See also Murray v. Abt Assoc., Inc.*, 18 F.3d
> 1376, 1378-79 (7th Cir. 1994).

*Id.* at 995-96 (emphasis added); *see also Venture Assoc. Corp. v. Zenith Data Sys. Corp.*, 987

F.2d 429, 432-33 (7th Cir. 1993) (letter of intent contemplating "the preparation and execution of

a mutually satisfactory Purchase Agreement" clearly evidenced an intent to *not* be bound until

execution of the formal contract); *Empro Mfg. Co., Inc. v. Ball-Co Mfg., Inc.*, 870 F.2d 423, 425-

426 (7th Cir. 1989) (breach of contract claim founded on letter of intent dismissed; letter

providing that parties would later enter into a "definitive agreement" was not a contract because

parties "have manifested an objective intent not to be bound"); *Senese v. Climatemp, Inc.*, 222

Ill. App. 3d 302, 311-12, 582 N.E.2d 1180, 1186 (1st Dist. 1991) (letter of intent attached to

complaint was not a contract; "A letter of intent demonstrates only that the signer intends to do

something in the future").

The only contract attached to the complaint is between IBM and the CTA

(although it is only a draft). Cmplt. Ex. 1. BSE alleges that the letters of intent on which it bases

its contract claim (Cmplt. Exs. 2-3) were attached as exhibits to the IBM/CTA contract. Cmplt. ¶

8. That contract, however, provides in no uncertain terms that it "confers no rights upon any of

the parties' employees, agents, *or contractors* or upon any other Person." Cmplt. Ex. 1 at §

19.11 ("No Third-Party Beneficiaries") (emphasis added). Thus, BSE has no rights under the

only actual contract before the Court.

BSE's "contract" claim, which is based entirely on letters of intent, should

therefore be dismissed.[4]

---

[4] Indeed, IBM did not even sign the documents BSE attaches to its complaint. BSE's claim that IBM
agreed to be bound, therefore, is even less persuasive than the arguments in the cases cited above.

**B.    The letters of intent also lack material terms essential to an enforceable contract.**

A contract is enforceable only if its terms are sufficiently definite. *Classic Fire & Marine Ins. Co.*, 1997 WL 767290 at *4. The promises made and the performance to be rendered by each party must be reasonably certain, and the plaintiff must provide enough information for the court to be able to ascertain whether the agreement has been breached. *Reese v. Forsythe Mergers Group, Inc.*, 288 Ill. App. 972, 980, 682 N.E.2d 208, 214 (2d Dist. 1997). If the purported agreement is missing essential terms, there is no contract. *Id.*, 288 Ill. App. at 981-82, 682 N.D. Ill. at 214-15 (no contract where parties did not execute agreement, set a price, determine final subject of contract or set a timetable for performance); *O'Neil & Santa Claus, Ltd. v. Xtra Value Imports, Inc.*, 51 Ill. App. 3d 11, 14, 365 N.E.2d 316, 318 (3d Dist. 1977) (no contract where plaintiff did not establish duration of contractual relationship, extent of services to be performed or payment terms).

Here, the letters of intent on which BSE relies contain none of the commercial terms necessary for the documents to constitute an enforceable contract. The alleged initial letter of intent provides nothing more than the amount IBM would pay BSE for "services." Cmplt., Ex. 3. The letter provides no explanation of what services were to be provided, who would be providing those services or when the services would be provided. Based on the letter of intent, neither the parties nor the Court would have any way of knowing whether BSE had met its obligations to IBM. Was BSE required to provide computer consulting services, security services or janitorial services? Was it required to work for a week or a year? Was it required to meet any performance objectives or just show-up? The letter also does not indicate when IBM was to pay--immediately, periodically throughout the engagement or when all the "services" had been provided. Without these essential terms, there is no contract. *See Ocean At'l*, 322 F.3d at 989 (contract claim dismissed where letter underlying that claim contained none of the terms

-8-

"one would expect to find in a multi-million dollar contract"); *Reese*, Ill. App. 3d at 981-82, 682 N.E.2d at 214-15; *O'Neil*, 51 Ill. App. 3d at 14, 36 N.E.2d at 318.

Although the subsequent letter of intent contains slightly more detail, it also lacks essential terms. Cmplt., Ex. 2. The August 2003 letter states that BSE will "provide development resources for Oracle Implementation." *Id.* It does not, however, explain what services those "resources" are to provide or whether the resources are required to meet any performance criteria (*e.g.*, project milestones or number of hours). Thus, it would be impossible to determine from the vague terms of this letter whether BSE had properly performed under the agreement. In addition, the second letter of intent does not contain any terms establishing when IBM's payment obligations are triggered. The indefiniteness of the documents on which BSE relies demonstrates why courts have repeatedly held letters of intent to not be legally enforceable contracts. *See* § I.A.; above.

## II.     BSE Has Not Alleged The Elements Required To State A Claim For Tortious Interference With Contract (Count II).

To state a claim for tortious interference with contract, a plaintiff must establish (1) the existence of a valid and enforceable contract between the plaintiff and a third party; (2) the defendant's awareness of the contract; (3) the defendant's intentional inducement of the third-party to breach that contract; (4) the third party's breach; and (5) damages to the plaintiff as a result of the breach. *HPI Health Care Serv., Inc. v. Mt. Vernon Hosp., Inc.*, 131 Ill. 2d 145, 156, 545 N.E.2d 672, 676 (1989).

As discussed below, BSE does not allege four of the five elements.

### A.     BSE fails to allege that it had a contract with Maureen Jones.

BSE's tortious interference claim is based on IBM's alleged refusal to accept a proposed BSE resource, Maureen Jones, for work on the CTA project. *See* Cmplt. ¶¶ 14-18. BSE does not, however, allege it had a contract with Ms. Jones. To the contrary, according to its complaint, BSE could not hire resources for the project until IBM had given its approval. *Id.* at ¶

-9-

11. BSE alleges that IBM did *not* approve Ms. Jones as a BSE resource, so, accepting BSE's
allegations as true, BSE did not enter into a contract with her. *See Indeck N. Amer. Power Fund,
L.P. v. Norweb*, 316 Ill. App. 3d 416, 431, 735 N.E.2d 649, 661 (1st Dist. 2000) (dismissing
tortious interference claim where no valid contract existed because, as in this case, the
defendant's consent was a precondition to the contract and that consent had not been given).[5]

### B.     BSE fails to allege that IBM was aware of a contract between BSE and Ms. Jones.

BSE also does not allege that IBM had any knowledge of a contract between BSE
and Ms. Jones. Nor can knowledge be inferred in this situation. Again, according to BSE, if
IBM did not approve Ms. Jones, BSE could not enter into a contract with her. Cmplt. ¶ 11.
Because IBM did not consent to Ms. Jones' hiring, IBM had no reason to believe that BSE had a
contract with her. For this additional reason, BSE's claim cannot stand. *Air Exch. v. BCI
Aircraft Leasing*, No. 00 C 2551, 2001 WL 185475, at *4 (N.D. Ill. Feb. 26, 2001) (claim
dismissed where defendant's knowledge of contract not pled).

### C.     BSE fails to allege that IBM acted intentionally or directed its actions toward a third person.

To state a claim for tortious interference with contract, the plaintiff must plead
that the defendant engaged in conduct directed toward a third party with the intent to interfere
with a contract between that party and the plaintiff. *See, e.g., Straka v. Francis*, 867 F. Supp.
767, 776 (N.D. Ill. 1994) (claim dismissed where intent not pled); *Illinois Bell Tel. Co. v. Plote,
Inc.*, 334 Ill. App. 3d 796, 806, 778 N.E.2d 1203, 1211 (1st Dist. 2002) (same). Thus, a plaintiff
does not state a claim for tortious interference where the conduct underlying that claim is
directed toward the plaintiff, rather than a third party--for example, where the conduct constitutes

---

[5] Even if BSE had alleged that it had a contract with Ms. Jones, the Court should dismiss its claim
because BSE did not attach the contract to its complaint or recite its terms. *See Moskowitz v. City of
Chicago*, No. 93 C 1335, 1993 WL 478938, at *9 (N.D. Ill. Nov. 16, 1993) (dismissing complaint
because plaintiff did not attach contract or identify specific terms of the contract); *Miller-Calabrese v.
Continental Grain Co.*, No. 96 C 6626, 1997 WL 392340, at *7 (N.D. Ill. July 8, 1997) (same).

60945v8

an alleged failure to abide by the terms of a contract between the plaintiff and the defendant. *See, e.g., George A. Fuller Co., A Div. of Northrop Corp. v. Chicago Coll. of Osteopathic Med.*, 719 F.2d 1326, 1331 (7th Cir. 1983) (claim dismissed where no inducement of third party pled because defendant's alleged actions were directed at plaintiff); *Mitchell v. Weiger*, 87 Ill. App. 3d 302, 305, 409 N.E.2d 38, 41 (1st Dist. 1980) (same).

BSE does not allege that IBM intentionally directed any actions toward a third party with the intent to induce a breach of contract. The alleged conduct with which BSE takes issue is IBM's rejection of Ms. Jones as a resource for the CTA project. Cmplt. ¶ 18. As BSE alleges, however, BSE agreed to this approval process as part of its alleged agreement with IBM. Cmplt. ¶ 11. The gravamen of BSE's claim, therefore, is that IBM failed to act in accordance with its obligations under an alleged contract between IBM and BSE. Because BSE's tortious interference claim is nothing more than a repackaged claim for breach of contract, it should be dismissed.

### D.    BSE fails to allege that Ms. Jones breached a contract with BSE.

Finally, BSE does not contend that Ms. Jones breached any agreement with BSE. BSE claims Ms. Jones ultimately worked on the CTA project through a different subcontractor, but it does not allege that such work constituted a breach of any contract with BSE. Cmplt. ¶ 18.

III.   **BSE's Claims For Tortious Interference With Prospective Economic Advantage Fail Because BSE Has Not Alleged A Valid Business Expectancy Or Tortious Conduct (Counts III-IV).[6]**

A plaintiff seeking relief for tortious interference with prospective economic advantage must allege that: (1) it had a valid business expectancy with a third party; (2) the defendant had knowledge of the expectancy; (3) the defendant intentionally interfered with the expectancy; and (4) the plaintiff suffered damages as a result of this interference. *Anderson*, 172 Ill. 2d at 406-07, 667 N.E.2d at 1299.

BSE's claims for interference with prospective economic advantage should be dismissed because (A) as a matter of law, BSE's hope that it might do business with the CTA in the future is not a valid business expectancy; (B) BSE does not allege that IBM intentionally directed any actions toward the CTA; and (C) BSE fails to allege that IBM acted with malice.

A.   **BSE does not allege a valid business expectancy.**

In order to allege a valid business expectancy, the plaintiff must identify a reasonable expectancy to contract with a third party. *See id.* Illinois courts have consistently demanded that this expectancy be imminent--a near certainty--before an enforceable legal interest will attach. *See Anderson*, 172 Ill. 2d at 407-08, 667 N.E.2d at 1299-1300; *Werblood v. Columbia Coll.*, 180 Ill. App. 3d 967, 976, 536 N.E.2d 750, 756 (1st Dist. 1989); *Williams v. Weaver*, 145 Ill. App. 3d 562, 569, 495 N.E.2d 1147, 1152 (1st Dist. 1986); *Titchener v. Avery Coonley Sch.*, 39 Ill. App. 3d 871, 876, 350 N.E.2d 502, 507-08 (2d Dist. 1976).

---

[6] In Count III, BSE purports to assert a claim for tortious interference with business relations, and, in Count IV, it purports to bring a claim for tortious interference with prospective business advantage. These are not separate causes of action; indeed, they are interchangeable. While the Illinois Supreme Court has referred to the tort as tortious interference with prospective economic advantage, *see Anderson v. Vanden Dorpel*, 172 Ill. 2d 399, 406-07, 667 N.E.2d 1296, 1299 (1996), other courts have referred to it as tortious interference with business relations. *Alfieri v. CSX Corp.*, 201 Ill. App. 3d 559, 569, 559 N.E.2d 166, 173 (1st Dist. 1990). Regardless of the moniker, both counts are based on an argument that BSE's prospects for doing future business with the CTA were damaged by IBM's interference. Both claims should be dismissed for the reasons set forth in Section III, above.

-12-

In *Anderson*, for example, the plaintiff had been approached by the YMCA regarding a position in its fund-raising department. 172 Ill. 2d at 403, 667 N.E.2d at 1297-98. The plaintiff interviewed with the director of personnel, senior vice president and a YMCA director. *Id.* She had been assured that all interviews had gone well and that she was going to be recommended for hiring as soon as she completed a follow-up interview. *Id.*, 172 Ill. 2d at 403-04, 667 N.E.2d at 1298. Before that final interview, her current employer told the YMCA's director that the plaintiff did not follow through with her assignments and that she did not get along well with co-workers. *Id.* As a result, the director cancelled the plaintiff's follow-up interview and the plaintiff was not hired. *Id.* The plaintiff sued her current employer for tortious interference with prospective economic advantage. The Illinois Supreme Court affirmed the dismissal of the plaintiff's claim, holding that she had established nothing more than a "mere hope" for employment, not a valid business expectancy. *Id.* at 407-08, 1299. *Accord Werblood*, 180 Ill. App. 3d at 976, 536 N.E.2d at 756 (no valid expectancy even where plaintiff had an on-going contractual relationship with a third party and had been assured of contract renewal); *Williams*, 145 Ill. App. 3d at 569, 495 N.E.2d at 1152 (no valid expectancy where parties had entered into previous fixed-term contract and discussed the possibility of similar agreement in the future).

In this case, BSE's "mere hope" of future CTA work is even more lacking than that discussed in the above cases. Cmplt. ¶¶ 19-26. BSE does not allege that it had discussed a future business arrangement with CTA. It does not allege that CTA had given BSE any indication that the CTA planned to contract with BSE in the future. It does not allege *any* interaction with the CTA in which a future project or contract was discussed. And it certainly does not allege facts showing that a contract between BSE and the CTA was imminent or a near-certainty. BSE's claim boils down to an allegation that if it had provided an additional $1.4 million worth of services on the CTA project, the CTA would have been so impressed with

-13-

BSE's performance that it would have given BSE additional business at some undefined point in the future. BSE's hope for future CTA business does not come close to a valid business expectancy under Illinois law. *See Anderson*, 172 Ill. 2d at 407-08, 667 N.E.2d at 1297-98; *Werblood*, 180 Ill. App. 3d at 976, 536 N.E.2d at 756; *Williams,* 145 Ill. App. 3d at 569, 495 N.E.2d at 1152.[7]

**B.    BSE does not allege that IBM engaged in intentional conduct directed toward a third party.**

A claim for tortious interference with prospective business advantage must be based on a defendant's intentional conduct directed at a third party. *Williams*, 145 Ill. App. 3d at 570, 495 N.E.2d at 1152-53. An allegation that a defendant's actions, no matter how wrongful, were directed at the plaintiff can never provide the basis for a claim of tortious interference. *See George Fuller Co.*, 719 F.2d at 1331-32 (dismissing tortious interference with prospective economic advantage claim where actions directed toward plaintiff); *Douglas Theater Corp. v. Chicago Title & Trust Co.*, 288 Ill. App. 3d 880, 888, 681 N.E.2d 564, 570 (1st Dist. 1997) (same); *Williams*, 145 Ill. App. 3d at 570, 495 N.E.2d at 1152-53 (same).

Here, the only third party with whom BSE alleges it had a reasonable expectancy of contract was the CTA. Thus, BSE is required to allege that IBM directed its actions at the CTA with the intent to interfere with BSE's prospective business relations with the CTA. *Williams*, 145 Ill. App. 3d at 570. BSE does not do so. Rather, BSE focuses on IBM's

---

[7] In addition, a plaintiff cannot base its claim of a business expectancy on an opportunity that the defendant himself provided the plaintiff. *See Bass v. SMG, Inc.*, 328 Ill. App. 3d 492, 503, 765 N.E.2d 1079, 1089 (1st Dist. 2002) (dismissing claim because allegation that defendant interfered with expectancy defendant had created by the parties' contract is "not a tort but a breach of contract"). In other words, a plaintiff cannot bring a tort claim against a defendant for interference with prospective economic advantage based solely on the defendant's alleged failure to abide by the terms of its contract with the plaintiff. *Id.* BSE's claims fail under this rule as well. BSE contends that IBM interfered with BSE's ability to bid on future CTA work because IBM did not approve BSE resources to work on the CTA project. Cmplt. ¶¶ 20 and 25. By BSE's admission, therefore, its prospective economic advantage was contingent on IBM's approval of BSE resources in accordance with the alleged contract between IBM and BSE. *Id.* at ¶ 11. The expectancy thus existed only because IBM was to provide it under the parties' alleged agreement. Because IBM, as a matter of law, cannot interfere with an expectancy it has created, BSE's claims must be dismissed. *Bass,* 328 Ill. App. 3d at 503, 765 N.E.2d at 1089.

60945v8

performance under the alleged contract between BSE and IBM. *See* Cmplt. ¶ 25. BSE alleges

that IBM breached its agreement to approve BSE resources to work on the CTA project. Cmplt.

¶ 26. This alleged conduct could, in theory (if there were an actual contract rather than a letter

of intent), constitute a breach of contract, but it certainly is not tortious. *See Williams*, 145 Ill.

App. 3d at 570, 495 N.E.2d at 1152-53.[8]

    **C.**    **BSE does not allege that IBM acted with malice.**

       Not all interference with prospective economic advantage is improper. A

competitor may lawfully compete for business and, in the process, upset the plaintiff's

expectations of doing business with a third party. *Candalaus Chicago, Inc. v. Evans Mill Supply

Co.*, 51 Ill. App. 3d 38, 48, 366 N.E.2d 319, 326-327 (1st Dist. 1977). Where it is clear from the

face of the complaint that the defendant is a competitor, then the burden falls to the plaintiff to

allege (and ultimately prove) that the defendant acted with malice. *Indeck*, 316 Ill. App. 3d at

431, 735 N.E.2d at 661. "Malice" as used here requires the plaintiff to plead that the defendant's

conduct was wrongful. *Candalaus*, 51 Ill. App. 3d at 47, 366 N.E.2d at 326.

       BSE alleges that IBM and BSE were in competition for future CTA business.

Cmplt. ¶ 25. BSE was therefore required to allege that IBM acted with malice. It did not do so.

**CONCLUSION**

       For each of the foregoing reasons, BSE's complaint should be dismissed in its

entirety with prejudice.

Dated: February 7, 2005

                    Respectfully submitted,
                    INTERNATIONAL BUSINESS MACHINES
                    CORPORATION

                    By: _____
                          One of Its Attorneys

---

[8] IBM notes, however, that under the Customer Solutions Agreement and the subsequent Statements of
Work, IBM was not obligated to accept BSE-presented resources. Therefore, even if the alleged conduct
is accepted as true, it would not constitute a breach under the parties' actual agreements.

-15-

60945v8

RECEIVED

MAR 1 1 2005

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

BUSINESS SYSTEMS ENGINEERING, INC.
Plaintiff

v.

INTERNATIONAL BUSINESS MACHINES
CORPORATION ("IBM"),
Defendant

Case Number 04 C 8254

JUDGE BUCKLO
MAGISTRATE JUDGE KEYS

## PLAINTIFF BSE'S RESPONSE TO THE MOTION TO DISMISS

### INTRODUCTION

Defendant IBM has moved to dismiss the complaint's four counts, asserting various fatal defects in each of them. Defendant's arguments are unavailing and without any factual development.

### THE FACTS ALLEGED

Plaintiff Business Systems Engineering Inc ("BSE") is a Chicago computer services firm, specifically a "minority business entity" and a "disadvantaged business entity". (Compl. ¶s 1, 9). Sometime prior to December of 2001 BSE learned that the Chicago Transmit Authority ("CTA") was contemplating restructuring its financial management computer system; so BSE approached Defendant IBM to partner on this CTA project (¶s 4, 5). Based on BSE's introduction, in December of 2001 Defendant IBM and the CTA entered into a lengthy systems integration services agreement (¶ 6, Ex. 1 to Compl.). Attached and incorporated into this signed IBM-CTA agreement was a certification by IBM and BSE that Plaintiff BSE is prepared to provide $8,560,000 in services to the CTA under the IBM-CTA agreement. (¶ 8, Ex. 1 to Compl.). IBM

1

needed to certify minority contractors such as BSE as part of the deal in order for IBM to get the CTA business (¶ 9).

Work began under the December 2001 IBM-CTA agreement. (¶9) IBM in its Memorandum to this Court judicially admits that "multiple statements of work in connection with the CTA project" were generated by IBM and BSE (Defendant's memorandum p. 1).[1]

After this project commenced, IBM and BSE, on August 8, 2003, amended the certification (¶ 9, Ex. 2 attached to Compl.).[2] IBM submitted this new certification to the CTA, as required, and the CTA approved it (Ex. 2 attached to Compl. ¶ 10). Under this amended certification, for the period 2002-2003, BSE was to: "provide development resources for Oracle implementation" and "provide development resources for conversions, interfaces and customizations", on the CTA project, for a quantity unit price of $3.6 million. (Ex. 2) The $3.6 million was referred to as the "Contract Amount" (Ex. 2), right above the IBM affidavit.

Under this new certification, BSE performed work, generated "Statements of Work", and was paid a total of about $2.2 million by IBM. (¶ 12; Defendant's Memorandum p. 1) As part of its effort, BSE contracted with "resources" - people - who, contingent on IBM approval, would be hired by BSE, and paid, under the agreement by money from IBM. (Compl. ¶s 11, 12).

BSE performed its obligations (¶ 12). IBM however, breached by, among other acts,

---

[1] Defendant IBM does not attach any of these referenced "statements of work" to its Memorandum; indeed such evidentiary detail is inappropriate on a Motion to Dismiss. But IBM does thereby concede that such work statements were generated between IBM and BSE.

[2] The copy of this document attached to the complaint is marked "copy of original", and its IBM affidavit line is blank. (Ex. 3 to Compl). IBM did agree, however, as the Complaint expressly pleads (¶ 9), and submitted the document to the CTA, which has the original signed by IBM. BSE sent a document request to Defendant IBM on November 24, 2004, which seeks, inter alia, signed originals of these documents.

failing to meet the $3.6 million "Contract Amount" of work, and by rejecting in bad faith people hired by BSE, only to later hire these people itself! (¶ 12). BSE lost all opportunity to do additional CTA work, and went under (¶s 24, 26).

So, essentially, BSE alleges that IBM used BSE's minority status to get the CTA contract, then stiffed BSE $1.4 million dollars, hired away BSE people, stole the CTA project from BSE, and effectively killed BSE.

## DEFENDANT'S ATTACK

Despite IBM's sworn statement to the CTA that BSE was to be paid a "Contract Amount" of $3.6 million; despite BSE's conceded work; despite BSE's being paid $2.2 million by IBM; IBM now argues that there was no agreement or contractual relationship between IBM and BSE. To state this proposition is to refute it. As to the tortious interference counts, (Counts II, III, and IV) IBM argues that BSE's complaint lacks specificity and evidentiary detail. This does not support a Rule 12 dismissal.[3]

A Rule 12(6) Motion to dismiss can be granted only if it appears "beyond doubt" that no set of facts can be proven which entitle plaintiff to recover. *Craig's Inc v. GE Capitol Corp.*, 12 F.3d 686, 688 (7ᵗʰ Cir. 1993). In a diversity case such as this, the contract law of Illinois applies, and in Illinois, contracts must be interpreted as a whole, rather than focusing on isolated portions. *Owens v. McDermott, Will & Emery*, 316 Ill.App.3d 340, 344; 736 N.E.2d 145, 150 (1ˢᵗ Dist. 2000).

---

[3] Defendant chose to remove this case to federal court, where notice pleading prevails. Whatever force its arguments might have had under more strict Illinois fact-pleading, they are inapt here.

3

### ARGUMENT

**A.    The IBM-BSE Agreement - Count I**

Defendant IBM bases its motion to dismiss the contract count (Count I) on a crabbed and narrow characterization of the sworn August 3, 2003 certification IBM made to the CTA. IBM accords dispositive force to the existence of the phrase "letter of intent" on this certification.

Of course, a contractual relationship can arise from multiple sources - documents; oral agreements; performance, reliance; conduct. "To prove a contract implied-in-fact the essential terms of the contract must be supplied by implication from the parties' _conduct or actions_," _O'Neil & Santa Claus, Ltd. v. Xtra Value Imports,_ 51 Ill.App.3d 11, 365 N.E.2d 316 (3rd Dist 1977). "Oral contracts are proved not only by what the parties have said, but also by what they have done." _Reese v. Forsythe Mergers Group_, 288 Ill.App.3d 972, 682 N.E.2d 208 (2d Dist. 1997). Count I alleges all of these sources. Together these sources created and defined the obvious contractual relationship between IBM and BSE. If there was no agreement between IBM and BSE, then there was no basis for IBM's payments.

Once the existence of _some_ agreement is acknowledged, as it must be, the only remaining question is - what are the material terms of that agreement. Because the parties operated for some time under this agreement, its terms can be inferred from their conduct in implementing it. The material terms of the agreement - the dollar amount; the work to be done; the duration; are all pleaded. Evidentiary detail will come from discovery - from representatives of the CTA, IBM, and BSE. The agreement was specific enough to trigger IBM to pay out $2.2 million, after all. That fact surely trumps any assertion, first made by an IBM attorney in a memo on a motion to dismiss, that IBM had no agreement with BSE.

4

To be sure, there is case law which holds that a traditional "Letter of Intent" is sometimes not an enforceable contract. Defendant quotes the 7th Circuit in *Ocean Atlantic Dev. Corp. v. Aurora Christian School Inc.*, 322 F.2d 983 (7th Cir. 2002)[4] for the rationale of this line of cases:

> As we recognized in *Empro Mfg. Co. v. Ball-Co Mfg., Inc.*, 870 F.2d 423. 424 (7th Cir. 1989), it is a common commercial practice for two negotiating parties to sign a letter of intent or an agreement in principal, signaling that they have come to a tentative agreement on the general outlines of a deal without having nailed down all of the details. Not infrequently, the negotiations that follow the execution of this document break down, prompting the disappointed party to sue on the theory that the preliminary document is binding...As we went on to hold, a letter of intent or a similar preliminary writing that reflects a tentative agreement contingent upon the successful completion of negotiations that are ongoing, does not amount to a contract that binds the parties.

Defendant argues that this doctrine "*is directly on point.*" (Defendant's memo p. 6). Hardly.

Here the sworn August 2003 IBM certification to the CTA, which is what Ex. 2 is, does not "reflect a tentative agreement". Rather, the August 2003 certification was made *after* performance under the IBM-BSE agreement was underway. The instant suit is thus not one in which "the negotiations that follow the execution of this document break down, prompting the disappointed party to sue...".

Defendant cannot prevail in negating the IBM-BSE agreement merely by trotting out, as a shibboleth, the phrase "letter of intent", out of the context of all the facts. *Empro, supra*; "letter of intent" not "magic words". Indeed, there are many Illinois cases which find a binding contract despite a "letter of intent" phrase.

The test is whether the parties evidenced an "intent to be bound" - an intent which can be inferred from all the circumstances - including the parties' acts and conduct. *GLS Dev. Inc. v.*

---

[4] Notably, *OceanAtlantic* was an appeal from a summary judgement; so the plaintiff's claim had survived a motion to dismiss.

5

*Wal-Mart Stores Inc.*, 1996 WL 296594 (N.D. Ill. 1996); *Yonan v. Oak Park Federal S & L*, 4

Ill.App.3d 754, 757; 281 N.E.2d 700 (1st Dist. 1972) (parties' "recognized there was a binding

contract by [their] acts and conduct"). See, "letter of intent" contracts enforceable: *Barton*

*Chem. Corp v. Pennwalt Corp*, 79 Ill.App.3d at 832-33 (letter "[c]onfirming our discussions"

was binding even though it called for a subsequent formal contract); *Weil, Friburg & Thomas,*

*P.C. v. Sara Lee Corp.*, 218 Ill.App.3d 383, 392, 577 N.E.2d 1344 (1st Dist. 1991) ("[l]etters

embodying preliminary negotiations" enforceable if "parties intended to be bound"); *Quake*

*Construction, Inc., supra*, 181 Ill.App.3d at 912-14 (same; "letter of intent"); *Inland Real Estate*

*Corp v. Cristoph*, 107 Ill.App.3d 183, 185, 437 N.E.2d 658 (1st Dist. 1982) (same; "depends on

the intent of the parties") *Harris v. American General Finance Corp.*, 54 Ill.App.3d 835, 837-38,

368 N.E.2d 1099 (3d Dist. 1977) ("proposal for an agreement" held to be a binding contract).

Even among "letter of intent" cases, we have found none in which, as here, both sides recognized

by conduct and performance that they had a binding agreement. *OceanAtlantic, supra*, on which

Defendant relies, observed that "anticipation of a more formal future writing does not nullify an

otherwise binding agreement".

    Defendant's instant motion to dismiss could be granted only if the total agreement

"unambiguously demonstrates that the parties... did not intend to be bound." *Quake*

*Construction Inc v. American Airlines Inc*, 181 Ill.App.3d 908, 913; 537 N.E.2d 863 (1st Dist.

1989) aff'd 141 Ill.2d 281, 565 N.E.2d 990 (1990); or if it is "clear" that no binding contract was

intended, and "no set of facts" could show otherwise. *Knightsbridge Realty Partners Ltd. - 75 v.*

*Pace*, 101 Ill.App.3d 49, 52-53; 427 N.E.2d 815 (1st Dist. 1981). The $3.6 million figure was

stated by the parties to be the "Contract Amount". To prevail on its motion, Defendant IBM

must show that "Contract Amount", plus subsequent performance, is dispositive <u>against</u> any intent to be bound. This IBM cannot do. "Contract" after all means <u>contract</u>!

So performance of the parties, by itself, establishes the existence of the IBM-BSE agreement. But a fair reading of the August 2003 certification - Ex. 2 - confirms this conclusion. This document, signed by both BSE and IBM- was also submitted to the CTA as part of the CTA-IBM contract. Far from reflecting "tentative" or "general outlines of a deal", the document has substantive purpose as a sworn representation to the CTA that BSE is a minority firm, and that its "Contract Amount" is $3.6 million, for the services described on the document. If IBM really didn't mean what it said in Ex. 2, then it could be prosecuted for perjury, and/or fraud against the CTA (as well as BSE).[5]

The Ex. 2 form is not captioned "Letter of Intent", but rather "Letter of Intent from DBE to perform as subcontractor, supplier an/or consultant." (DBE stands for "Disadvantaged Business Entity) As alleged, to get and keep its contract with the CTA, IBM needed a minority subcontractor such as BSE (¶ 9). The certification was submitted to the CTA not before, but *during* performance under the IBM-BSE agreement.

The August 2003 form certification states, in the fine boilerplate print, that BSE and IBM "will enter into a formal written agreement for the above work" conditioned upon IBM's execution of a contract with the CTA. By August of 2003, of course, the CTA-IBM contract had already been in force for almost 2 years (since December 2001). The only subsequent written agreements between IBM and BSE are the various "statements of work" mentioned by IBM in its memorandum. These statements were obviously sufficient under Ex. 2 for IBM, for BSE, and

---

[5] If discovery confirms IBM's present position - that it lied to the CTA on Ex. 2, and had no agreement with BSE, then Plaintiff would have to consider adding a fraud count.

for the CTA - for the working relationship continued until IBM's breach.

In view of the pleaded facts - there is clearly an agreement between IBM and BSE. Ex. 2 - the August 2003 sworn IBM certification - supports the existence of this ongoing agreement. It expressly states that the "Contract Amount" is $3.6 million, after all.

Defendant's Memo (ps.1, 3) states that IBM and BSE "did subsequently enter into contracts (a customer solutions agreement and multiple Statements of Work) in connection with the CTA project." While this statement acknowledges the Statements of Work as contractual documents, it is seriously wrong as to the "Customer Service Agreement".[6] We can represent to the Court that this "Customer Service Agreement" was *not* made "subsequently" to the August 2003 IBM certification (Ex. 2). Rather, this "Customer Service Agreement" is dated "July 20, 2000". This is over a year *before* the first IBM-BSE certification of November 14, 2001 (Ex. 3) and the December 2001 IBM-CTA contract. It is over three years *before* the Ex. 2 IBM-BSE certification.

As President John Adams famously quipped, "facts are stubborn things". The facts surely will be fleshed out as the case proceeds. Legal characterizations of these facts is what can change, as common sense and the federal rules of pleading recognize. By Defendant IBM's own conduct, there clearly was a contractual relationship between IBM and BSE. That is Count I. *Legal contract phrases are merely the tools lawyers use to mold the stubborn facts.* But whatever use we may make of these tools in the case at bar, the immutable pleaded fact is that there was an agreement between IBM and BSE. A Rule 12 motion to dismiss which states that there was no agreement must fail. IBM paid millions to BSE for services rendered, and IBM swore under

---

[6] Notably Defendant chose not to attach the document to Defendant's Memorandum (indeed, such evidentiary detail is inappropriate on a federal motion to dismiss).

oath to the CTA that the BSE "Contract Amount" was $3.6 million. If IBM now wants to take the position that it didn't mean any of this; so be it. But such a reckless position cannot dismiss the case on a Rule 12 motion.

The terms of the contractual relationship were never questioned for any alleged indefiniteness by either party. Indeed, any missing details could be readily supplied simply by looking as what the parties actually did in carrying out their agreement. "Acts and conduct" used to determine contractual intent: *Yonan v. Oak Park Federal S. & L Assn*, 4 Ill.App.3d 754, 757; 281 N.E.2d 700 (1st Dist 1972); *Barton Chemical Corp v. Pennwalt Corp*, 79 Ill.App.3d 829, 834; 399 N.E.2d 288 (1st Dist. 1979). The law does not favor destroying contracts for alleged "uncertainty", particularly where, as here, the parties commenced actual performance. J. Calamari & J. Perillo, Law of Contracts (3d. Ed. 1987), § 2-9 at page 56; UCC §2-204(3), (815 ILCS 5/2-204(3)), Restatement, Contacts 2d (1979), § 32(2): the terms need only "provide a basis for determining the existence of a breach and for giving an appropriate remedy.

Defendant does not argue that the amount of the agreement - the $3.6 million "Contract Amount" - is indefinite. (Defendant memo p. 8). The document supporting the contract - Ex. 2 to the Complaint, expressly dates the agreement for "2002-2003", so there can be no question as to its duration. Rather, Defendant appears to fault the agreement for lacking a detailed definition of the "services" to be performed by BSE (id.) IBM even waxes so ignorant about the $2.2 million it paid to BSE, that IBM conjectures that maybe BSE was to be paid for "janitorial services" (Defendant's memo, p. 8). Enough. We doubt that any IBM executive will testify that he didn't have the foggiest idea why IBM paid BSE over two million dollars.

The written portions of the agreement are clear that BSE is to provide services to the CTA

9

under the CTA -IBM contract, specifically to "provide development resources for Oracle implementation" and "development resources for conversions, interfaces, and customization". IBM has judicially admitted that under this agreement "multiple statements of work" were submitted, and paid by IBM (memo, p. 1). There is not one scintilla of pleading or argument suggesting that IBM didn't know what it was doing.

As Defendant IBM insisted (by paying the statements of work) the agreement is certainly clear enough for a court to determine whether the parties have performed it, and to award relief if they have not. No more is required. *David M. Kaufman Associates, Inc. v. Lake County Trust Co.,* 157 Ill.App.3d 926, 929-30, 510 N.E.2d 919 (1st Dist. 1987) ("all agreements have some degree of indefiniteness and some degree of uncertainty;" so long as "essential terms" can be determined, and there is a "basis for deciding whether the agreement is kept or broken," uncertainty about "incidental or collateral terms" does not vitiate the agreement). Indeed, Illinois courts have upheld far less specific agreements than this one. See, e.g., *Reese v. Melahn,* 53 Ill.2d 508, 511-13, 292 N.E.2d 375 (1973) (parties intended to develop cemetery; simple oral agreement that plaintiffs "were to be paid $7500 each for their full-time services and were to receive 20% of the venture" was held enforceable).

*Academy Chicago Publishers v. Cheever,* 144 Ill.2d 24, 578 N.E.2d 981 (1991), *Sethness-Greenleaf, Inc. v. Green River Corp,* 1993 WL 475498 (N.D.Ill. 1993), 5, and *Champaign National Bank v. Landers Seed Co.,* 165 Ill.App.3d 1090, 1093, 519 N.E.2d 957 (4th Dist. 1988), all squarely reaffirm that (as stated in *Cheever,* 144 Ill.2d at 30) "[a] contract may be enforced even though some contract terms may be missing or left to be agreed upon;" all that is needed is a "basis for deciding whether the agreement has been kept or broken."

10

"Actions speak louder than words", we all learn as children, and the truism finds support in Illinois contract law. (see discussion supra, pp, 1, 6, and 7) The parties "Contract Amount" was $3.6 million; and the described CTA "services" were specific enough for IBM to pay out over $2 million pursuant to the statements of work. These are <u>admissions</u> by IBM. If BSE can prove this, it is entitled to $1.4 million in damages under Count I.

Defendant IBM's motion to dismiss Count I must be denied.

**B.      Tortious Interference with contract and with prospective advantages**

The Count II claim is relatively simple. BSE had a contract with Maureen Jones and others. (¶ 14) Pursuant to the BSE-IBM agreement, BSE sought IBM's approval of that "resource" (¶s 14, 15). In Ms. Jones' case, IBM rejected her; yet a few weeks later IBM accepted her when she was submitted to IBM by a BSE competitor. (¶ 18). Thus, the theory goes, IBM interfered with BSE's contract with Ms. Jones - indeed BSE could pay her nothing - by rejecting her in bad faith when she was a BSE "resource". IBM was clearly aware of BSE's contractual relationship with Ms. Jones because BSE was submitting her to IBM as a BSE "resource". IBM thus destroyed, improperly, the Jones - BSE contractual relationship. This is sufficient to plead a tortious interference count.

"Tortious interference with contract" is a tort which has been recognized in Illinois for at least a century. *See Doremus v. Hennessy*, 176 Ill. 608, 52 N.E. 924 (1898); *HPI Health Care Services Inc. v. Mt. Vernon Hospital*, 131 Ill.2d 145 (1989).

Its elements are: (1) an existing contract between plaintiff and another, (2) defendant's knowledge of this contract, (3) an intentional inducement of the third party to breach or otherwise render impossible the performance of the contract, (4) a subsequent breach or other similar act by the third party, and (5) resulting damage to the plaintiff. *Fuller Co v. Chicago College of*

11