## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| **BUSINESS SYSTEMS ENGINEERING, INC.,** | ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | No. 04 C 8254 |
| **INTERNATIONAL BUSINESS MACHINES CORPORATION ("IBM"),** | ) ) ) | |
| Defendant. | ) ) | |

### MEMORANDUM OPINION AND ORDER

Plaintiff Business Systems Engineering, Inc. ("Business Systems") and defendant International Business Machines Corporation ("IBM") have a business dispute about a project with the Chicago Transit Authority ("CTA") to perform work on the CTA's computer system. Business Systems believes that IBM shorted it money due under a contract and otherwise interfered with its contractual and business relations, and has brought breach of contract and other tort claims against IBM. IBM has moved for summary judgment on all of Business Systems's claims against it.[1] For the following reasons, I grant IBM's motion.

---

[1]IBM has also brought a counterclaim against Business Systems and its CEO Nathan Paige ("Paige"), so IBM is technically also a counter-plaintiff and Business Systems a counter-defendant. IBM's motion for summary judgment does not concern the counterclaim, though, so for ease of discussion this opinion refers to IBM only as "defendant" and Business Systems only as "plaintiff."

Summary judgment is appropriate where the record and affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Steen v. Myers*, 486 F.3d 1017, 1021 (7th Cir. 2007) (citing FED. R. CIV. P. 56(c)). If the moving party meets this burden, the non-moving party must go beyond the pleadings and set forth specific facts showing that there is a genuine issue for trial. *Ptasznik v. St. Joseph Hosp.*, 464 F.3d 691, 694 (7th Cir. 2006) (citing FED. R. CIV. P. 56(e); *Becker v. Tenenbaum-Hill Assocs., Inc.*, 914 F.2d 107, 110 (7th Cir. 1990)). The existence of merely a scintilla of evidence in support of the non-moving party's position is insufficient; there must be evidence on which the jury could reasonably find for the non-moving party. *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). I must construe all facts in the light most favorable to Business Systems and draw all reasonable and justifiable inferences in its favor. *Anderson*, 477 U.S. at 255.

Taking the facts in the light most favorable to Business Systems, the following are the undisputed facts:[2] Business Systems

---

[2]IBM filed a statement of material facts pursuant to Local Rule 56.1. Business Systems filed a response to those facts that agrees with some facts but disagrees with others. However, many of Business Systems's disagreements with IBM's statement of facts merely deny the proposed fact and state in response only to "See

is a Delaware corporation with its principal place of business in Chicago, Illinois. It formerly provided application consulting, systems integration, and other computer consulting to various entities. Nathan Paige is a resident of Illinois and was at all relevant times Business Systems's Chief Executive Officer and/or Chief Financial Officer. IBM is a New York corporation with its principal place of business in New York. It provides computer hardware and systems consulting.

On December 28, 2001, IBM and the CTA entered into an "Information Technology Services Agreement" ("ITSA"). Section 3 of the ITSA provides that IBM agrees to perform certain services for the CTA in exchange for compensation. These services pertain to the "installation, modification, implementation, conversion, integration, and configuration of the ERP System," defined in the ITSA as

> the Enterprise Resource Planning System
> Described in Exhibit A, Exhibit D, and the
> Documentation. The ERP System includes the

---

Pl. Resp. to Def. Motion for S.J." or otherwise do not comply with the local rules. This is an insufficient denial. Under Local Rule 56.1, disagreements must include "specific references to the affidavits, parts of the record, and other supporting materials relied upon." Many of IBM's statements of material fact contain legal conclusions or purport to state Business Systems's position on certain issues, and are therefore inappropriate or irrelevant themselves. I will consider admitted any appropriate statements of material fact to which Business Systems has not appropriately replied. I also agree with IBM that Business Systems may not incorporate its memorandum in opposition to summary judgment into its own additional statement of facts under Local Rule 56.1(b)(3)(C).

> ERP Software, Third-Party Software specified
> in Exhibit E, modifications, configurations,
> and any customer programming specified in
> Exhibit A, as well as all revisions and
> customizations to any or all of the above
> software which may be required and is provided
> for in Exhibit A hereto.

(Ex. 6 to IBM's Mot., ITSA §§ 2.14, 3.1.) Section 5.3 of the ITSA also provides that IBM agrees to "abide by all CTA policies that reasonably pertain" to it. One of those policies, originally attached as an exhibit to the ITSA, is a policy entitled "Special Conditions: Disadvantaged Business Enterprise Commitment" ("DBE Commitment").[3] Under the terms of the DEB Commitment, bidders for contract work with the CTA agree to "expend not less than" 30 percent "of the total contract price (inclusive of any and all modifications and amendments), if awarded, for contract participation" by Disadvantaged Business Enterprises ("DBEs"). Business Systems was certified by the CTA as a DBE.

The ITSA provides that the parties agree that the "formation, interpretation, and performance" of the ITSA "shall be governed by the laws of the State of Illinois." (Ex. 6, ITSA § 19.10.) The ITSA also contains a provision stating that IBM's obligations to the CTA under the ITSA "shall be, in the aggregate, as set forth" in the ITSA and that the ITSA "is an agreement between the parties,

---

[3]The copy of the ITSA attached as Exhibit 6 to IBM's motion for summary judgment does not include the exhibits originally attached to the ITSA, but the list of ITSA's exhibits indicates that Exhibit L was the DBE Commitment. Further, the parties agree that the DBE Commitment formed part of ITSA.

and, except for the provisions of the preceding sentence, confers no rights upon any of the parties' employees, agent, or contractor's or upon any other Person." (*Id.* at ¶ 19.11.)

According to Business System's CEO Paige, Business Systems worked on various projects for the CTA starting in at least 1996. Its last project as "prime contractor" with the CTA ended in 2002. Paige testified that Business Systems became interested in the CTA's ERP implementation project, to take the CTA's ERP system and move it to a server-based system like SAP or Oracle (the "ERP project"). Paige also testified that Business Systems did not bid for the ERP project because it was not large enough to handle a project of that size and had certain other constraints; Business Systems knew that it "would need to have a very large partner to pursue this deal." Business Systems spoke with potential larger partners including IBM.

Business Systems and IBM eventually entered into a "Customer Solutions Agreement" ("CSA"). That agreement is dated July 20, 2000, before the date the CTA and IBM entered into the ITSA. The opening paragraph of the CSA provides:

> This Agreement dated as of 07/20/2000 ("Effective Date"), between International Business Machines Corporation ("Buyer")and Business Systems Engineering ("Supplier"), establishes the basis for a multinational procurement relationship under which [BSE] will provide [IBM] the Deliverables and Services described in [Statements of Work] issued under this Agreement.

(Ex. 10, CSA at 1.) The terms of the CSA do not specify what deliverables and work BSE will provide IBM, only that BSE "will provide Deliverables and Services as specified in the relevant [Statement of Work] only when specified in a [Work Authorization]." (Ex. 10, CSA at § 2.0.) The CSA defines "Work Authorization" as IBM's "authorization in either electronic or tangible form for [Business Systems] to conduct transactions under this Agreement (i.e., a purchase order, bill of lading, or other [IBM] designated document). A [Statement of Work] is a [Work Authorization] only if designated as such in writing" by IBM. (*Id.* at § 1.0.) The CSA defines "Statement of Work" as "any document attached to or including in this Agreement which describes the Deliverables and Services, including any requirements, specifications or schedules." (*Id.*) The CSA also contains a choice of law provision that specifies that "the laws of the State of New York applicable to contracts executed in and performed entirely within that State will apply if any part of the transaction is performed within the United States." (*Id.* at § 14.3.)

The parties agree that BSE's work on the ERP project was governed in part by Statements of Work. They also agree that IBM timely paid Business Systems for all work on the ERP project pursuant to the Statements of Work and Purchase Orders. These Statements of Work and Purchase Orders expressly reference the CSA. The explicit terms of the CSA and the Statements of Work do not

reference IBM providing Business Systems with $3.6 million worth of work on the ERP project. The Statements of Work define resources, tasks and deliverables that BSE was to provide to IBM, set forth hourly rates and estimated hours of work, and authorize work in an amount of roughly $2.2 million.

According to the affidavit of James Lautenbach, who during the relevant time period was a client executive at IBM responsible for the relationship with the CTA, as part of IBM's response to the CTA's request for a proposal for the ERP project IBM had to submit two completed CTA forms to the CTA: a "Schedule C, Letter of Intent From DBE to Perform as Subcontractor, Supplier and/or Consultant" ("Schedule C") signed by each DBE that would work as IBM's subcontractor on the ERP project, and a "Schedule D, DBE Utilization Plan" ("Schedule D") signed only by IBM. As part of its response to CTA's request for a proposal, IBM submitted a Schedule C from BSE, attached as Exhibit 28 to its motion for summary judgment ("Original Schedule C"). The Schedule C states:

> [BSE] is prepared to provide the following described services or supply the following described goods in connection with the above named project/contract:

| Pay Item No. Description | Quantity Unit Price | Total |
|---|---|---|
| Services | $2,124,550.00 | $2,124,550.00 |
| Software | $1,500,000.00 | $1,500,000.00 |
| . . . . | Grand Total: | $3,624,550.00 |

． ． ．

> [BSE] will enter into a formal written
> agreement for the above work with [IBM],
> conditioned upon your execution of a contract
> with the [CTA], and will do so within (5) five
> working days of [IBM's] receipt of a signed
> contract from the [CTA].

(Ex. 28, Original Schedule C.)  Noland Joiner signed Original

Schedule C on or about August 23, 2000, on BSE's behalf as BSE's

Vice President of Business Development. (*Id.*)  On August 8, 2003,

BSE signed a new Schedule C, attached as Exhibit 29 to IBM's motion

for summary judgment ("Revised Schedule C.")  The Revised Schedule

C was substantially similar to the Original Schedule C except the

services or goods that BSE was "prepared to provide" was changed to

read:

| Pay Item No./Description | Quantity/Unit Price | Year |
|---|---|---|
| Provide development resources for Oracle Implementation | $3.6 Million | 2002-2003 |

． ． ．

| | | |
|---|---|---|
| Grand Total: | $3.6 Million | |

(Ex. 29, Revised Schedule C.)  Lautenbach testified in his

deposition that the $3.6 million participation arose because of

telephone and in-person discussions between IBM and BSE.  Paige

testified in his deposition that IBM and BSE had an original

"handshake agreement" for $3.6 million in services.  Later there

was another handshake agreement to increase this amount to $8.6

8

million because "it was unclear what . . . services would be needed for the increase in contract value from 20 million to 42 million." Later, that was reduced by agreement to $3.6 million.

On or about August 12, 2003, IBM signed a Schedule D, attached to IBM's motion for summary judgment as Exhibit 31. John Ciaramella signed Schedule D as the "Project Partner" on IBM's behalf. (Ex. 31, Schedule D.) Schedule D included the following chart:

| Name of DBE Firm(s) | Type of Work to be Performed (in accordance with Schedule Cs) | Contract Amount |
|---|---|---|
| [BSE] | Provide development resources for conversions, interfaces, and customizations | $3.6 Million |

Total DBE Credit: $3.6 Million

(Exhibit 31, Schedule D.) Schedule D also included a section entitled "Affidavit of Prime Contractor" that stated, in part:

> The undersigned [IBM] will enter into formal agreements with all listed DBE firms for work as indicated by this Schedule D and accompanying Schedules, and will enter into such agreements within five (5) business days after receipt of the contract executed by the [CTA].

(*Id.*) Certain BSE officers, including Joiner, BSE co-owner and former vice president Michael Ford ("Ford") and Cecelia Bolden, BSE's former project manager, admitted that they understood Schedules C and D as non-contracts.

BSE and IBM agree that at certain times throughout the CTA project BSE did not submit candidates to fill a position on the CTA project.  BSE and IBM also agree that beginning in 2003, BSE fell behind in paying certain subcontractors, and had outstanding balances with some of them, causing them to threaten to leave the CTA project.

BSE submitted Maureen Jones ("Jones") to IBM for consideration for a position on the CTA project.  Terrence Roberts testified that BSE spoke with Jones and that Jones filled out an "Application for Employment."  He further testified that BSE's arrangement with Jones was that it would offer her employment if she was accepted for the CTA project by the CTA and IBM.  Later, CTA accepted Jones in a different position through a different DBE.  BSE never provided Jones with any documents, and Jones never signed any documents asking to be submitted to IBM for any position.

The parties agree that BSE did not receive $3.6 million worth of work on the CTA project, and instead that IBM only provided BSE with $2.2 million in work.  Terrence Roberts ("Roberts"), a BSE officer, testified in his deposition that this was because BSE "did not have the opportunity to get the billable hours required to meet that 3.6 million."  Roberts further testified that had BSE received the additional work, it would still be in business.

BSE subsequently brought a complaint against IBM.  The complaint alleges that BSE originally approached IBM to "partner"

on the CTA's request for a proposal on its ERP system. (Amended Complaint, ("Compl.") ¶¶ 4-5.) The complaint further alleges that "[a]s a result of BSE's efforts, in December of 2001" IBM and CTA entered into an agreement. (*Id.* at ¶ 6.) BSE alleges that as part of IBM's agreement with the CTA, IBM guaranteed BSE work totaling $8,560,000, but breached that agreement (*Id.* at ¶¶ 9, 12.) BSE brings claims for (1) breach of the contract between IBM and BSE; (Count I); (2) breach of the contract between IBM and the CTA, brought as a third-party beneficiary (Count II); (3) tortious interference with contractual relations for interfering with BSE's relationship with Maureen Jones (Count III); (4) tortious interference for business relations for interfering with "the business relations BSE had with BSE's resources" (Count IV); and (5) tortious interference with a prospective economic advantage or business opportunity by intentionally refusing to utilize certain BSE resources as part of the CTA project in order to drive BSE out of business (Count V). This motion for summary judgment on all of these counts followed.

## II.

IBM has moved for summary judgment on Count I of BSE's complaint, BSE's breach of contract claim, arguing that the only agreement between BSE and IBM did not obligate IBM to provide BSE with any certain amount of work. BSE contends that there is at least a partial dispute of fact whether IBM had an oral contract

with BSE to provide BSE with $3.6 million worth of work on the CTA project.  I disagree and grant summary judgment for IBM on this claim.

There is no dispute that under IBM's agreement with the CTA IBM needed the participation of DBEs in order to work on the ERP project.  The parties also agree that IBM spoke with BSE about working as a DBE on the ERP project, and that BSE signed a letter of intent to work as a DBE.  Taking the facts in the light most favorable to BSE, IBM and BSE had additional discussions about the amount of BSE's participation on the ERP project.  According to BSE, after discussions and preliminary agreements IBM and BSE reached a final "handshake agreement" that BSE would provide $3.6 million in services on the ERP project.

The fact that certain BSE witnesses testified that there was an "agreement" between BSE and IBM does not establish the existence of a contract.[4]  Under Illinois law, the existence of a contract is a question of law.  *Ass'n Benefit Servs., Inc. v. Caremark RX, Inc.*, 493 F.3d 841, 849-50 (7th Cir. 2007) (citations omitted).  "No contract exists under Illinois law, and, indeed, under principles of general law, if the agreement lacks definite and certain terms; nor is a contract formed by an offer that itself lacks definite and certain material terms and does not require such

_____

[4]Similarly, the fact that certain IBM witnesses may have testified that there was a "commitment" and an "agreement" with BSE does not establish the existence of a contract.

terms to be supplied by an acceptance." *Id.* at 850 (citations omitted); *see also Midland Hotel Corp. v. Reuben H. Donnelley Corp.*, 118 Ill. 2d 306, 314, 113 Ill. Dec. 252, 256, 515 N.E.2d 61, 65 (1987) (citation omitted) ("For a contract to be enforceable, the essential terms of the contract must be definite and certain."). A contract "is sufficiently definite and certain to be enforceable if the court is enabled from the terms and provisions thereof, under proper rules of construction and applicable principles of equity, to ascertain what the parties have agreed to do." *Midland Hotel Corp.*, 118 Ill. 2d at 314, 113 Ill. Dec. at 256, 515 N.E.2d at 65 (quoting *Morey v. Hoffman*, 12 Ill. 2d 125, 131, 145 N.E.2d 644, 647-48 (1957)).

Here, even taking the facts in the light most favorable to BSE, there is no evidence of a written contract between IBM and BSE obligating IBM to provide $3.6 million in work to BSE. The Revised Schedule C does indicate that BSE was "prepared to provide" $3.6 million in services, but it does not indicate that IBM agreed to provide BSE with that amount of work. Further, as I held in ruling on IBM's motion to dismiss an earlier version of BSE's complaint, neither the Original Schedule C nor the Revised Schedule C are contracts because they are "too vague and incomplete to establish a legally enforceable agreement by which BSE could hold IBM accountable for the alleged breach." *Bus. Sys. Eng'g, Inc. v. Int'l Bus. Machs. Corp.*, No. 04 C 8254, 2005 WL 1766374, at *2

(N.D. Ill. July 20, 2005). The letters do not describe what work BSE is to perform, the timing of the services, the timing of IBM's payments, or other terms and conditions. *Id.* They merely reference the parties' intent to enter into a future written contract, which the parties agree they never did. The CSA, while perhaps a contract, does not establish any specific amount of work IBM agrees to provide to BSE or vice versa, and only references that work will be provided as specified in Statements of Work and Work Authorizations. The parties likewise agree that the Statements of Work and Work Authorizations, on their own terms, only obligate IBM to provide BSE with $2.2 million in work, which IBM did.

BSE contends that the contractual obligation for IBM to provide BSE with $3.6 million in work came from in-person and oral conversations and a "handshake agreement." However, I agree with IBM that BSE has not met its burden to survive summary judgment on this issue. To survive summary judgment, BSE must provide specific facts that, if true, establish the existence of an enforceable contract. Here, BSE's statement of additional facts only conclusorily establishes that BSE may have believed that it had an agreement for IBM to provide BSE with $3.6 million in work for the CTA project. There is no evidence about what promises BSE made in exchange and when the parties entered into this oral contract. This is true even if I consider this oral contract as some

extension or modification of the Revised Schedule C or the Original Schedule C. In short, BSE has not presented enough facts from which a finder of fact could conclude that BSE and IBM had an enforceable oral contract. Therefore, I grant IBM's motion for summary judgment on Count I of BSE's complaint.

## III.

BSE's amended complaint also alleges that BSE has the right to sue for breach of the ITSA since BSE contends that it is a third-party beneficiary of that contract. I disagree.

Under Illinois law, there is a strong presumption that the parties to a contract only intend the terms of the contract to apply to them, and not to third parties. *Ball Corp. v. Bohlin Bldg. Corp.*, 187 Ill. App. 3d 175, 177, 134 Ill. Dec. 823, 824, 543 N.E.2d 106, 107 (Ill. App. Ct. 1989). "In order to overcome that presumption, the implication that the contract applies to third parties must be so strong as to be practically an express declaration." *Id.* (citing *Alaniz v. Schal Assocs.*, 175 Ill. App. 3d 310, 313, 124 Ill. Dec. 851, 853, 529 N.E.2d 832, 834 (Ill. App. Ct. 1988)). A direct third-party beneficiary may enforce a contract where, although the beneficiary is not a party to a contract, the contracting parties intend the third-party beneficiary to benefit from the contract. *Am. United Logistics, Inc. v. Catellus Dev. Corp.*, 319 F.3d 921, 930 (7th Cir. 2003) (citing *A.E.I. Music Network, Inc. v. Bus. Computers, Inc.*, 290

F.3d 952, 955 (7th Cir. 2002); *XL Disposal Corp. v. John Sexton Contractors Co.*, 168 Ill. 2d 355, 361, 213 Ill. Dec. 665, 669, 659 N.E.2d 1312, 1316 (1995)). Whether a party is a direct third-party beneficiary is determined by assessing "the intent of the parties based on the contract as a whole as well as the understandings between the parties at the time of the contract's execution." *Id.* (quoting *A.J. Maggio Co. v. Willis*, 316 Ill. App. 3d 1043, 1051, 250 Ill. Dec. 376, 383, 738 N.E.2d 592, 599 (Ill. App. Ct. 2000); *Ball Corp.*, 187 Ill. App. 3d at 177, 134 Ill. Dec. at 824, 543 N.E.2d at 107). These cases affirm the general analysis used to determine a parties' intent under a contract - by looking solely to the language of the contract where the contract's terms are unambiguous, and by considering other evidence of the parties' intent only where the language of the contract is ambiguous. *See, e.g.*, *Much v. Pac. Mut. Life Ins. Co.*, 266 F.3d 637, 643 (7th Cir. 2001) (citations omitted); *Taracorp Inc. v. NL Indus., Inc.*, 73 F.3d 738, 743 (7th Cir. 1996) (citations omitted). The interpretation of an unambiguous contract is a question of law; the consideration of extrinsic evidence to interpret an ambiguous contract is a question of fact. *Taracorp*, 73 F.3d at 743 (citations omitted).

Here, BSE contends that "clearly" it was to benefit from the ITSA. I disagree. The ITSA contained a provision that plainly states that except for IBM's obligations to the CTA and the CTA's

obligations to IBM, the ITSA "confers no rights upon any of the parties' employees, agent, or contractor's or upon any other Person." (Ex. 6, ITSA § 19.11.) The language of the ITSA is unambiguous, unlike the contract in *American United Logistics*, a case BSE cites for its contention that a party may be a third-party beneficiary even where the contract contains express contractual terms precluding third-party beneficiaries. 319 F.3d at 930-31. In *American United Logistics*, two provisions of the contract contradicted one another; one provision stated that the contract was not intended to confer a benefit on any third party, but another provision specifically provided that a third party would have the authority to run a warehouse as specified in the contract. *Id.* at 931. Given the ambiguity in the language, the Seventh Circuit concluded that the third party had stated a valid third-party beneficiary claim. *Id.*

In this case, there is no similar ambiguity, only the section of the ITSA stating that the ITSA confers no rights upon any third party. BSE has pointed to no specific provision of the ITSA conferring it a benefit, only arguing that "clearly it was to benefit." It also points out that the CTA sent IBM a letter indicating that IBM was in breach of its contract with the CTA by not complying with the DBE program requirements. While the ITSA acknowledges and accounts for the fact that IBM, as a contractor, must comply with the requirements of the DBE program, its use of

the Schedule C letters of intent demonstrates the parties understood that IBM, although required to have a certain percentage of DBE participation under the contract, would enter into separate contractual agreements with the DBEs involved in the contract. The unambiguous language of the ITSA does not support the conclusion that BSE was a direct third-party beneficiary, so I grant summary judgment to IBM on this claim.

IV.

BSE has also brought a claim for tortious interference with contractual relations, contending that IBM tortiously interfered with its contractual relationship with Maureen Jones. IBM contends there is no evidence that BSE had a contract with Jones. I agree.

Under Illinois law, establishing a tortious interference with contractual relations claim requires a plaintiff to show that (1) a valid contract existed; (2) defendant knew the contract existed; (3) defendant intentionally and maliciously induced the breach of contract; (4) the breach of contract was caused by defendant's wrongful conduct; and (5) plaintiff suffered damage as a result. *Fitzpatrick v. Catholic Bishop of Chicago*, 916 F.2d 1254, 1256 (7th Cir. 1990) (citations omitted); *HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.*, 131 Ill. 2d 145, 154-55, 137 Ill. Dec. 19, 23, 545 N.E.2d 672, 676 (1989) (citations omitted). BSE contends that IBM tortiously interfered with BSE's contractual agreement with

Jones by refusing to hire Jones for the CTA project but then later hiring Jones themselves for the same project.

BSE's tortious interference with contractual relations claim fails because BSE has not shown, taking the facts in the light most favorable to it, that it had a contract with Jones. BSE argues that its agreement with Jones was an oral agreement, even though Terrence Roberts of BSE testified that its only agreement with Jones was the "Application for Employment" that Jones filled out to work for BSE. In its response to IBM's motion, BSE contends that its contract with Jones was that it would screen Jones, "approve her, send her name to IBM and CTA, and if approved, employ her." This plainly does not establish the existence of a contract because BSE has not presented any facts showing that Jones accepted this offer. Acceptance is, of course, a basic requirement for a contract under Illinois law. *Volker v. Porsche Cars N. Am., Inc.*, 353 F.3d 516, 528 (7th Cir. 2003) (citations omitted). Since IBM has met its burden on summary judgment to show there is no genuine issue of material fact, BSE needed to come forward with specific facts showing there is a genuine issue for trial. It has not done so, so I grant summary judgment to IBM on this claim.[5]

---

[5]IBM also contends that BSE has no evidence that IBM interfered by failing to hire Jones, because the evidence is that the CTA, not IBM, rejected Jones. BSE admitted that the CTA ultimately rejected Jones. It has presented no evidence that IBM had any involvement in this rejection, which is a necessary element to establish its claim. This is an alternate ground for granting summary judgment for IBM on this claim.

V.

Finally, BSE has brought two claims (Count IV and V) for tortious interference with prospective economic advantage for interfering with "the business relations BSE had with BSE's resources."[6] Both of these claims stem from the allegation that BSE had a long-term relationship with the CTA and that IBM's interference with BSE on the ERP project caused BSE to lose any future business opportunities it would have otherwise had with the CTA. IBM contends that BSE did not have any "near certainty" about future work with the CTA, and that IBM did not direct any of its actions at the CTA as required to establish this tort. I agree that BSE has not shown that IBM directed its actions at the CTA.

Tortious interference with prospective economic advantage under Illinois law requires BSE to show that (1) it had a reasonable expectation of entering into a valid business relationship with the CTA; (2) IBM knew of this expectancy; (3) IBM

---

[6]BSE's complaint refers to these two claims as claims for tortious interference with business relations and tortious interference with prospective economic advantage. Illinois courts use these and other terms to describe the same tort. *See, e.g.,* *Fellhauer v. City of Geneva*, 142 Ill. 2d 495, 511, 154 Ill. Dec. 649, 656-57, 568 N.E.2d 870, 877-78 (1991); *Kruger v. Menard Elec. Coop.*, 169 Ill. App. 3d 861, 864-65, 119 Ill. Dec. 952, 954, 523 N.E.2d 708, 710 (Ill. App. Ct. 1988); *Downers Grove Volkswagen, Inc. v. Wigglesworth Imports, Inc.*, 190 Ill. App. 3d 524, 527, 137 Ill. Dec. 409, 412, 546 N.E.2d 33, 36 (Ill. App. Ct. 1989). The Restatement uses the term "interference with prospective contractual relation" to describe this tort. 4 Restatement (Second) of Torts § 766 B (1979). For ease of discussion, this opinion refers to this tort as tortious interference with prospective economic advantage.

purposefully interfered by preventing BSE's expectancy from being fulfilled; and (4) damages resulted from IBM's interference. *See Burrell v. City of Mattoon*, 378 F.3d 642, 652 (7th Cir. 2004) (citations omitted). A "reasonable expectation" requires more than the hope or opportunity of a future business relationship. *Anderson v. Vanden Dorpel*, 172 Ill. 2d 399, 408, 217 Ill. Dec. 720, 724, 667 N.E.2d 1296, 1300 (1996). Further, to establish this tort BSE must show that IBM directed its tortious activity at the CTA, the party with whom BSE intended to do business. *Schuler v. Abbot Labs.*, 265 Ill. App. 3d 991, 994, 203 Ill. Dec. 105, 108, 639 N.E.2d 144, 147 (Ill. App. Ct. 1993) (citations omitted).

Here, like its other claims, BSE has failed to present specific facts showing that there is a genuine issue of fact about this claim. BSE has not presented evidence that IBM directed its allegedly wrongful activities at the CTA. Indeed, BSE has never even clearly articulated what IBM's wrongful activities were. Presumably, BSE refers to IBM's failure to provide BSE with the $3.6 million on the CTA project, although BSE has not shown that this was "wrongful" since it has not shown that IBM had a contractual obligation to do so. Further, BSE has presented no evidence that IBM directed its activity at the CTA. BSE has presented no evidence that the CTA was even involved in IBM's independent decisions whether to give certain work to BSE, even if this work was on a CTA project. Since IBM has provided citations

to the record and evidence that there is no genuine issue of material fact, it is BSE's burden to come forward with some specific facts showing there is a genuine issue for trial. It has not done so. I grant summary judgment for IBM on this claim.

VI.

Because I find IBM is entitled to summary judgment on all claims, I need not address its arguments about punitive and consequential damages, lost revenue and profits. For the reasons stated above, I grant summary judgment for IBM on all of BSE's claims. IBM still has a defamation counterclaim against BSE and Paige, brought in this court on diversity jurisdiction under 28 U.S.C. § 1391(a). Since this counterclaim has not been the subject of any motion to dismiss or motion for summary judgment, it remains in dispute.

**ENTER ORDER:**

_____
**Elaine E. Bucklo**
United States District Judge

Dated: October 11, 2007